Gail Renee Simmons has appealed her conviction in the circuit court of DeSoto County of the crimes of aggravated assault and simple assault upon Hazel Stigler. We find no reversible error and affirm.
 FACTS
On June 30, 1987, Eldridge went to Stigler's home in Senatobia. She and Stigler went for a ride in Eldridge's car. While riding around, Eldridge stopped the car and a woman wearing a black raincoat, a black hat, and sunglasses got into the backseat *Page 1194 
of the car. Stigler did not know the woman was Simmons until she got into the car. (T.III. 201-202)
As they drove to Coldwater, Stigler and Simmons got into an argument over dating the same man. Eldridge then headed north on Interstate 55, and stopped the car on the side of the road two miles from the Hernando exit in DeSoto County. (T.III. 206) Simmons got out of the backseat, opened the passenger door, and attempted to pull Stigler out of the car by her hair, while Eldridge held one of Stigler's arms. (T.III. 206-207)
Simmons then started stabbing Stigler with an ink pen, and bit Stigler on the face. (At trial, Stigler introduced photographs, Ex. 3-1 and 3-2, showing the scars left by the wounds.) Stigler was then forced into the backseat. (T.III. 207-210)
Eldridge turned the car around and headed south on the Interstate. Simmons told Stigler that she was going to burn her hair off. She could not get her cigarette lighter to work. Eldridge drove to her house in Senatobia to get some scissors. Simmons held Stigler in a choke hold. While going east on Highway 4, Simmons cut Stigler's hair and her bra. (T.III. 210-212, 225)
Eldridge then drove south on Interstate 55 to Batesville. While in Batesville, Simmons threw the contents of Stigler's purse and her shoes into a garbage can. Stigler saw that Simmons had a gun. (T.III. 213)
Afterwards, Eldridge drove north on Highway 51 to Sardis. Stigler tried to jump out of the car, but Simmons hit her in the head with the gun, and they drove to Como. When they arrived at Como, Simmons and Eldridge tied Stigler up and made her call her sister from a telephone outside a service station, and tell her sister that she was going to Memphis with a friend. (T.III. 214-222)
Eldridge and Simmons then took Stigler, still tied, to a field east of Como and left her there. She was able to free herself and flag a policeman, who took her to the police station in Como. Later, she was taken to the Senatobia Community Hospital where her wounds were treated. (T.III. 223-227)
The next morning, Stigler went to Sardis and filed charges against Eldridge and Simmons in the justice court of Panola County. (T.III. 157) Afterwards, she took Officers Cleve Gale and Jessie Mabry to the field where Eldridge and Simmons had left her. At the scene, they found some of her clothing, her bra, and her purse with a pair of scissors still clipped on the strap. (T.III. 173-173, Ex. 7-9)
Officer David Baker was sent to the service station in Batesville to retrieve evidence from the garbage can. He found Stigler's shoes, papers, and receipts in the garbage can. (T.III. 147, Ex. 5-ID)
Stigler showed Sammy Webb, Victim Assistance Coordinator, all of the places that Eldridge and Simmons had taken her, and the telephone where she was forced to telephone her sister. (T.IV. 228)
Stigler filed four affidavits in the justice court of Panola County on July 1, two of which charged Eldridge with kidnapping and aggravated assault, and two of which charged Simmons with kidnapping and aggravated assault. Warrants were issued and the two were arrested. The State was represented by the county attorney in pursuing these charges. The preliminary hearing date was July 24. On July 23 Robert Kelley, assistant district attorney, telephoned the justice court judge that the State wanted to dismiss the charges. The next morning, the day of the hearing, the county attorney and counsel for Stigler and Simmons appeared. The county attorney was unaware that the State wanted to dismiss the charges until that morning. The justice court held that in view of the telephone call from Kelley he was going to dismiss the charges.
Simmons and Eldridge were jointly indicted by the grand jury of DeSoto County on September 1 on five counts:
 I. Conspiracy to commit an assault in violation of Miss. Code Ann. § 97-1-1(a).
 II. Kidnapping in violation of Miss. Code Ann. § 97-3-53.
 III. Aggravated assault in violation of Miss. Code Ann. § 97-3-7(2)(a) by feloniously assaulting Stigler with *Page 1195 
a pen, and puncturing her face, neck and hands, and also biting her under circumstances manifesting extreme indifference to life.
 IV. Simple assault, by menancing Stigler with a firearm in violation of Miss. Code Ann. § 97-3-7(a)(a).
 V. Simple assault, cutting the hair of Stigler in violation of Miss. Code Ann. § 97-3-7(1)(a).
Simmons was indicted alone on a sixth count of carrying a concealed weapon after a previous conviction and in violation of Miss. Code Ann. § 97-37-1(d).
Trial was had in February, 1988. No objection to the court's jurisdiction was raised until the State had put on its case and rested. Defense counsel then, and for the first time, raised the question of the court's jurisdiction to hear this case because the affidavits for aggravated assault and kidnapping had been filed in Panola County justice court. The court overruled the defendants' challenge to its jurisdiction.
The jury found Eldridge and Simmons not guilty on counts one, two and four, and Simmons not guilty on count six. Both were found guilty, however, of aggravated assault under count three, and simple assault under count five, cutting Stigler's hair.
Eldridge did not appeal. Simmons was sentenced to serve twenty years for aggravated assault, with ten years suspended, and six months for simple assault, to run concurrently with the first sentence.
Simmons has appealed.
 LAW I. DID THE TRIAL COURT ERR IN DETERMINING THAT VENUE WAS PROPER IN DESOTO COUNTY, MISSISSIPPI?
On her appeal Simmons concedes that either the circuit court of Panola, Tate or DeSoto county would have had jurisdiction to try this case, but argues that the prosecution was actually commenced in Panola County by the filing of the affidavits there charging her with kidnapping and aggravated assault, the justice court's issuance of warrants, and her arrest on these charges. She contends therefore that the criminal courts of Panola County thereafter had exclusive jurisdiction to try these criminal charges.
Article 3, § 26 of our Constitution mandates that all criminal prosecutions be had in "the county where the offense was committed."
Section 99-11-19 of Miss. Code Ann. in Code Chapter 11, "Jurisdiction and Venue," states:
 When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun.[1] [Emphasis added]
The several decisions of this Court addressing this question under varying scenarios bear analysis. In Coleman v. State,83 Miss. 290, 35 So. 937, 64 L.R.A. 807 (1904), the defendant Coleman shot his wife in Coahoma County, and she was carried to Quitman County where she died the next day. The grand jury of Quitman County indicted him for manslaughter, he was arraigned and entered a plea of not guilty. There was then a nolleprosequi entered by the State by the court's consent. Thereafter, Coleman was indicted for and convicted of murder in the circuit court of Coahoma County. He filed a plea in abatement to the Coahoma County indictment claiming the Quitman County circuit court had jurisdiction of this cause, which was denied. We reversed.
 Section 1334, Code 1892 [Miss. Code Ann. § 99-11-19], was designed to meet just such a contingency as arose in the instant case. Under the common law, as construed in the Stoughton Case, before *Page 1196 
cited, where a homicide was committed partly in one jurisdiction and partly in another, it was doubtful whether the offender could be prosecuted in either, but this is not true as the law now exists. Section 1334 [Miss. Code Ann. § 99-11-19] provides that where an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county where the offense was commenced, prosecuted, or consummated, "where prosecution shall be first begun." That provision controls the case at bar. The state can begin its prosecution in any of the counties in which any of the criminal agencies operate — anywhere that any act is committed in prosecution of the criminal design — but, having chosen the tribunal before which the party accused shall stand trial, it cannot, of its own motion, divest that court of jurisdiction, and begin another prosecution before another court in another jurisdiction. . . . Therefore, the prosecution in the instant case having been first begun in the circuit court of Quitman county, the state could not divest that county of its jurisdiction, and rightfully institute another prosecution in a different county. By the terms of the statute, concurrent jurisdiction was vested in the circuit courts of both counties, and the one first attaching becomes exclusive. The trial could not, on the application of the state, have been transferred to any other county, because this is not permitted by law, and the method here adopted is simply an attempt to do by indirection what cannot be done directly. . . . Section 1334 [Miss. Code Ann. § 99-11-19] providing that in all criminal cases, when the courts of different counties have concurrent jurisdiction, jurisdiction shall vest in the courts of the county "where prosecution shall be first begun," is simply declaratory of a well-defined and firmly established legal doctrine. It grew out of the comity of nations, and was intended to prevent conflicts between courts of concurrent jurisdiction, whether of the same or different counties or countries, and was found necessary to insure the orderly administration of the criminal laws. But it is more than a mere rule of procedure. It is a substantial and valuable right guaranteed by the law to a party accused of crime. It insures that he shall not twice be placed in jeopardy for the same offense; that he shall be forced to undergo but one trial, and shall not be harassed by repeated indictments in different courts and different jurisdictions. . . . The circuit court of Quitman county, having first acquired jurisdiction of the crime with which this appellant stands charged, must maintain it throughout. The entering of the nolle prosequi in that court does not prevent the grand jury of that county, if it so chooses, from now presenting an indictment against appellant, charging him with murder in slaying of Ella Coleman. [Emphasis added]
83 Miss. at 297-300, 35 So. at 938-939.
In State v. Hughes, 96 Miss. 581, 51 So. 464 (1910), an affidavit was filed in an Attala County justice court charging Hughes with embezzlement. Following a preliminary hearing he was bound over to await the action of the grand jury of Attala County. The grand jury either refused or failed to indict. Thereafter Hughes was indicted by the grand jury of Hinds County under a code section relating to embezzlement and providing that prosecution could be had in the county where the money was converted, or the county in which the accused was obligated to pay over the funds. Under this section either the Attala or Hinds county courts had jurisdiction.
The Hinds County circuit court dismissed for want of jurisdiction and the State appealed. We affirmed.
 It will be seen that the sole question presented is: Was the affidavit before the justice of the peace, followed by the issuance of a warrant for the arrest of Hughes and a committal trial, binding him over under bond to answer any charge by indictment at the next term of the circuit court, the "commencement of a prosecution," within the meaning of the law, so as to give the Attala court exclusive *Page 1197 
jurisdiction, when it subsequently appears that no indictment was returned? In short, in order to constitute the "commencement of a prosecution" for felony, must there be an indictment before the courts of the county in which the prosecution is begun shall have exclusive jurisdiction? The trial court thought not, sustained the pleas, and discharged the defendant, and in so doing, we think, rendered a correct judgment.
 * * * * * *
 In the Coleman Case the question arose on an indictment by a grand jury, and in this case it is upon an affidavit charging a felony in a committing court, followed by the failure of the grand jury to indict; but clearly there was a "commencement of the prosecution" in Attala county in every liberal and true sense, and that county alone has jurisdiction. The question is the same, whether it arises upon an affidavit or indictment, and it is not necessary that the court in which it commences shall have full jurisdiction to finally dispose of the charge. The policy of our statute in regard to this is clearly outlined in section 1415 of the Code [Miss. Code Ann. § 99-1-7], which provides that "a prosecution may be commenced * * * by the issuance of a warrant, or by binding over or recognizing the offender to compel his appearance to answer the offense, as well as by indictment or affidavit." It is seen that this section makes no distinction between an indictment and an affidavit.
96 Miss. at 585-586, 51 So. at 464-465.
Atkinson v. State, 132 Miss. 377, 96 So. 310 (1923), involved defendants who shot Owens in Leake County. Owens was then taken to Hinds County and later died from the wounds. Before he died, affidavits charging the defendants with assault and battery with intent to murder were filed in Leake County justice court, warrants were issued and they were both arrested. Nothing further was done pending Owens either surviving or dying.
When Owens died, an affidavit charging the defendants with murder was filed in the First Judicial District of Hinds County. Then, without the consent of the defendants, the prosecution begun in Leake County was dismissed. The defendants were thereafter indicted for and convicted of murder in the circuit court of the First Judicial District of Hinds County. We reversed.
 The question therefore is whether the prosecution begun before the justice of the peace in Leake county which was pending until after the death of Owens was such a beginning of a prosecution for said offense as gave the courts of that county exclusive jurisdiction to proceed to a final judgment.
 As it appears to the court this question is answered in the affirmative by the cases of Coleman v. State, 83 Miss. 290, 35 South. [at] 939, 64 L.R.A. 807, 1 Ann. Cas. 406 406, and State v. Hughes, 96 Miss. 581, 51 So. 464.
 It is contended on behalf of the state, however, that those cases are not decisive of the question here involved, because in each of those cases the crime charged had been entirely consummated when the first prosecution was begun, while in the case before the court the state says that the crime had not been completed until the death of Owens, which took place in the First district of Hinds county, and that therefore no prosecution for said crime could have been begun prior to that time in Leake county; in other words, that the prosecution begun in Leake county was not one for murder, but for a lesser offense, viz. shooting with intent to kill and murder, and therefore it was not the commencement of a prosecution in the meaning of said statute.
 We hold, however, that the proceedings begun in Leake county was the beginning of a prosecution within the meaning of said section 1406, Code of 1906 (Hemingway's Code, § 1161), for the following reasons: It should be borne in mind that the fatal wound which resulted in Owens' death had already been inflicted when the proceeding in Leake county was begun. The criminal act had already been consummated. So far as *Page 1198 
appellants were concerned, they had done all they ever did do to perpetrate the crime.
132 Miss. at 395, 96 So. at 311.
There were two dissents filed in this case. One member of the Court was of the view that because assault and battery and murder were two separate crimes, the prosecution for murder was not begun in Leake County. The other dissent was of the view that Section 27 of the Constitution only authorized an accused to be tried for a felony under an indictment, and therefore no Leake County court ever acquired jurisdiction.
In Hogarth v. State, 317 So.2d 384 (Miss. 1975), the defendant was first indicted by the grand jury of Forrest County on a drug law violation, but the circuit court of its own motion dismissed the indictment for lack of jurisdiction. Thereafter, Hogarth was indicted by the grand jury of Lamar County, and a motion was filed to quash the indictment because the Forrest County circuit court had jurisdiction under Miss. Code Ann. §99-11-19.
The circuit judge sustained the motion and the State appealed. This Court affirmed, quoting at length from the Coleman, supra,
opinion.
 Section 99-11-19 first appeared in the Code of 1857. Over the 118-year span from 1857 to 1975 this statute has remained unchanged and is still the law.
317 So.2d at 385.
In Parker v. State, 244 Miss. 332, 348, 141 So.2d 546, 553 (1962), an affidavit for murder was first filed against Parker in Harrison County, but later dismissed by the county attorney for the reason that the murder was consummated entirely in Jackson County. Parker was convicted of murder in Jackson County, and on appeal this Court affirmed. In doing so, we recognized the validity of Coleman, supra, and Atkinson, supra, but held that the entire crime of murder was carried out in Jackson County, and therefore Harrison County never had jurisdiction.
In Passons, et al. v. State, 208 Miss. 545, 555,45 So.2d 131, 133 (1950), the defendants were charged with robbery of a truckload of liquor. Hinds County has two judicial districts. The county court of Hinds County, however, had county-wide jurisdiction. An affidavit was filed in the county court alleging that the offense was committed in "Hinds County," and the county court following a hearing bound the defendants over to await the action of the grand jury of the Second Judicial District of Hinds County, which was the location of the robbery. We held that the prosecution had not been commenced in the First Judicial District of Hinds County, and the case therefore distinguishable fromColeman, supra, and Atkinson, supra.
It would thus appear firmly established by 85 years of case law that when two or more counties have concurrent jurisdiction of a crime, the commencement of prosecution fixes the exclusive jurisdiction in the county in which it is begun.
 BUT
In a quite analogous factual scenario, this Court has run down a parallel track and paradoxically come to the opposite conclusion
In Rogers v. State, 101 Miss. 847, 58 So. 536 (1912), an affidavit was filed against the defendant in justice court charging him with a liquor law violation. Thereafter he was indicted by the grand jury of the county. On the day set for his justice court trial, the state dismissed the prosecution in justice court over the objection of the defendant. Following his conviction in circuit court, he contended on appeal that it did not have jurisdiction to try him. We rejected his contention with the following observations:
 We need not follow the course the pleading took; suffice it to say that it is the contention of appellant that, because as an affidavit had been made in the justice court, a court of concurrent jurisdiction with the circuit court, the circuit court could not thereafter acquire any jurisdiction to proceed with this indictment for the same offense, and that the action of the county attorney was a fraud on the jurisdiction of the justice court. *Page 1199 
 In the case of Smithey v. State, 93 Miss. 257, 46 So. 410 [(1908)], and in Neely v. State
[100 Miss. 211], 56 So. 377 [1911], we held that, where concurrent jurisdiction is vested in two courts, the court first acquiring jurisdiction acquires exclusive jurisdiction, and that if a proceeding is instituted in another court about the same subject-matter after one of the courts of concurrent jurisdiction has acquired control, the suit should be dismissed in the last court to acquire jurisdiction. The above statement of the rule is undoubtedly the correct law, but those cases have no application to this case. The reason of the rule is to prevent confusion and conflicts in jurisdiction and to prevent a person from being twice tried for the same offense, but no defendant has a vested right to be tried in any particular court of concurrent jurisdiction. When one court of concurrent jurisdiction has acquired jurisdiction and voluntarily relinquishes it by a nolle pros. or dismissal of the case, there can be no legal or logical reason for preventing the other court from proceeding. Under such circumstances, there can be no confusion or conflict between the courts for the reason that only one court then has jurisdiction, or is trying to exercise it.
 At the date that this plea in abatement was filed, no other court had jurisdiction of the offense and there was therefore no impediment in the way of his trial under the indictment. It can make no difference to this appellant from what motives the justice of the peace may have acted in dismissing this suit. The justice of the peace undoubtedly had a right to dismiss it, and, having done so, the appellant has no cause to complain because there is another court of competent jurisdiction and equally as well capacitated to try the case as the justice of the peace. The appellant can only be interested in having but one prosecution before a fair and impartial tribunal in whatever court he is arraigned for trial on the charge. The state is only interested in seeing to it that prosecutions for infraction of the law be conducted in at least one of the courts.
 Counsel proceeds upon the idea that the indictment does not confer any jurisdiction on the circuit court because an affidavit had formerly been made in the justice of the peace court. This is an erroneous conception of the law. The circuit court has jurisdiction of the subject-matter, and the indictment is a valid indictment conferring jurisdiction on the court to try the offender for the offense charged, subject to his right, if the fact existed, to defeat the jurisdiction of the circuit court by showing that he was being prosecuted at the time in another court of concurrent jurisdiction for the same offense. But the pleadings show that this was not a fact.
101 Miss. at 851-853, 58 So. at 537.
In Chandler v. State, 140 Miss. 524, 106 So. 265 (1925), we followed Rogers, supra, and held that while the State, with the consent of the justice court judge could dismiss a misdemeanor proceeding and the prosecution begun anew in the circuit court, the dismissal had to be made on the return day of the warrant, or day fixed for trial. At any other time it could not be done without the consent of the defendant. To the same effect is Bassv. State, 159 Miss. 132, 131 So. 830 (1931).
In Hegwood v. State, 206 Miss. 160, 166, 39 So.2d 865, 866 (1949), an affidavit was first made against the defendant in justice court for a liquor law violation, but on the day of the hearing, when counsel for both sides were present, the State moved to dismiss the charge without prejudice, which was sustained by the justice court. Thereafter, he was indicted by the circuit court on the same offense. Following Rogers, supra,
we held:
 We are of the opinion that the circuit court correctly retained jurisdiction in the case at bar, and that the indictment was valid.
206 Miss. at 169, 39 So.2d at 867.
Finally, in Rhodes v. State, 335 So.2d 907 (Miss. 1976), in a misdemeanor prosecution for simple assault, an affidavit was first filed in justice court and the defendant *Page 1200 
brought to trial, resulting in a hung jury. Thereafter, without any dismissal of the charges in justice court, an affidavit was filed in the county court charging the defendant with the same offense. He was tried and convicted.
We held:
 The crime of assault and battery is one over which the justice of the peace court has concurrent jurisdiction with the county court and circuit court. [citations omitted]
 It is well settled by decisions of this Court that, in the absence of fraud or collusion, when concurrent jurisdiction exists in two courts, the court first acquiring jurisdiction acquires exclusive jurisdiction. [citations omitted]
 However, when one court which has concurrent jurisdiction with another court has acquired jurisdiction but voluntarily relinquishes it by a nolle pros or dismissal of the cause, the other court may proceed. Hegwood v. State, 206 Miss. 160, 39 So.2d 865 (1949); Hampton v. State [138 Miss. 196, 103 So. 10 (1924)], supra; Rogers v. State, supra.
335 So.2d at 908.
We then held, however, that because the proceedings in justice court had never been dismissed nor had that court relinquished jurisdiction, the county court had no authority to try the case.
This Court apparently never acknowledged any inconsistency between its two lines of decisions.
We find no distinction between dismissing a misdemeanor charge without prejudice in justice court and thereafter commencing it anew in the circuit court of a county, the two having "concurrent jurisdiction," and dismissing a prosecution begun in one county and begin it anew in a court of another county having "concurrent jurisdiction."
We note that there was no harassment of the defendants or prejudice as to any constitutional right to due process or against double jeopardy. Nor is such claimed. Panola and DeSoto counties are in the same circuit court district. Indeed, defense counsel never got around to objecting to the circuit court hearing the matter until the State had rested its case.
We find no impediment to the DeSoto County circuit court retaining jurisdiction and concluding this case despite the fact criminal proceedings by affidavit had been initiated in a justice court in Panola County. To the extent that Coleman v. State,supra; State v. Hughes, supra; Atkinson v. State, supra; Parkerv. State, supra; and Passons v. State, supra, hold to the contrary, they are hereby expressly overruled. In this modern day of transportation and communication, there is no jurisdictional
basis to deny jurisdiction to a court of concurrent jurisdiction in another county of a case which has been dismissed without prejudice to the State in another court.
Nor does this holding do violence to the mandate of Miss. Code Ann. § 99-11-19, dealing with crimes in which several counties having concurrent jurisdiction, and providing that jurisdiction shall be in the county where "prosecution shall first be begun." Of course, where a prosecution is initiated in one county, the court of that county does have sole jurisdiction, and no criminal court in another county can commence a prosecution while the case is pending in the first county. This does not mean, however, that the court of the county first acquiring jurisdiction cannot voluntarily relinquish its jurisdiction, and without prejudice to the State. Having done so, it has no further interest in the case, and there is then no impediment to a prosecution in a criminal court of another county with concurrent jurisdiction of the criminal offense.
 II. DID THE TRIAL COURT ERR IN RULING THAT THE ASSAULT CHARGES CONSTITUTED SEPARATE, DISTINCT OFFENSES?
Simmons was convicted of both aggravated and simple assault. Count 3 of the indictment charged:
 That GAIL RENEE SIMMONS AND JANICE ELDRIDGE . . . did unlawfully, wilfully, feloniously, and recklessly cause *Page 1201 
serious bodily injury to Hazel Alicia Stigler by biting Hazel Alicia Stigler on her cheek and puncturing Hazel Alicia Stigler's face, neck and hands with a pen, under circumstances manifesting extreme indifference to the value of human life, in direct violation of Section 97-3-7(2)(a),
Mississippi Code 1972 Annotated, as amended, contrary to the form of the statute in such cases provided, and against the peace and dignity of the State of Mississippi. (emphasis added)
Count 5 charged:
 That GAIL RENEE SIMMONS AND JANICE ELDRIDGE . . . did unlawfully, wilfully, feloniously, and purposely, knowingly or recklessly cause bodily injury to Hazel Alicia Stigler by shearing her hair, in direct violation of Section 97-3-7(1)(a), Mississippi Code 1972 Annotated as amended, contrary to peace and dignity of the State of Mississippi. (emphasis added)
(T.I. 5-6)
Miss. Code Ann. § 97-3-7 (Supp. 1974) reads as follows:
 (1) A person is guilty of simple assault if he (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; . . . and, upon conviction, he shall be punished by a fine of not more than five hundred dollars ($500.00) or by imprisonment in the county jail for not more than six (6) months, or both. . . .
 (2) A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; . . . and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the penitentiary for not more than twenty (20) years. . . . (emphasis added)
Simmons claims that she should have only been convicted under one charge since the offenses arise out of the same transaction. Simmons cites Wolf v. State, 281 So.2d 445 (Miss. 1973), to support her argument.
 The general rule is stated in 22 C.J.S. Criminal Law § 295(3) (1961) in a headnote as follows:
 An accused may not properly be prosecuted for two offenses with relation to narcotics where both arise out of the same transaction and one is necessarily incident to the other, but where the same transaction gives rise to separate and distinct offenses, a prosecution for one will not ordinarily bar prosecution for the others.
Id. at 447.
Wolf, supra, however, dealt with the possession and production of a narcotic drug. Possession merges into the production offense. The State claims that the case at hand does not deal with a lesser included offense as in Wolf, supra. We agree. The offenses are separate and distinct even though they arise out of the same sequence of events.
 Temporal proximity does not generate a judical union of separate and distinct criminal acts, nor does the presence of a common nucleus of operative facts.
Ball v. State, 437 So.2d 423, 425 (Miss. 1983). See alsoArmstead v. State, 503 So.2d 281, 284 (Miss. 1987); Pharr v.State, 465 So.2d 294, 300 (Miss. 1984).
There was a sufficient gap in time between the assaults to constitute separate offenses. The stabbing and biting took place while they were parked on the interstate. The shearing took place after they returned to Senatobia to get the scissors.
 [E]ach of the two convictions were based on distinct and separate acts. Although the elements of the two offenses are identical, dissimilar proof was required to prove each. In the first incident, Ms. Moctezuma was attacked from behind as she stood near a desk, and was then stabbed in the shoulder, chest and abdomen. The appellant stopped stabbing her, and she fainted. The second act occurred when the victim regained consciousness and went to the telephone to call for help. She was again attacked, but was stabbed in the legs, hand and *Page 1202 
sides. In this case, it is clear that the appellant himself broke off the first attack. He returned to attack her when she attempted to use the telephone. A significant gap exists between the first and second attack so that the criminal transaction may not be called uninterrupted or unintermittent. Moreover, the fact that the crimes were committed in rapid succession does not negate the fact that separate crimes were committed, so long as a separation does exist. [Emphasis added]
Weatherly v. State, 733 P.2d 1331, 1337-1338 (Okla. Crim. App. 1987).
 III. DID THE TRIAL COURT ERR IN DENYING SIMMONS' MOTION FOR A DIRECTED VERDICT OR ALTERNATIVELY FOR A NEW TRIAL?
Simmons claims that there was "nothing in the record to show an assault in a manner to produce serious bodily injury or by means likely to produce death." Furthermore, she claims that the simple assault conviction was not supported by the evidence.
Simmons cites Brooks v. State, 360 So.2d 704 (Miss. 1978), to support her argument. In Brooks, this Court reversed an aggravated assault conviction because there was "insufficient evidence to prove that appellant attempted to cause serious bodily injury[.]" Id. at 706. Brooks, is distinguishable from the case at hand. In Brooks, the defendant hit the victim with a book. This Court further held:
 [W]e are unable to say in these particular circumstances that the book used in the attack constituted "a deadly weapon or other means likely to produce death or serious bodily harm . . ." We can only surmise as to what would have resulted had the attack continued and as we have stated before, the mere probability of the guilt of a particular crime cannot support a verdict of guilty. [citations omitted] Therefore, we are of the opinion the appellant can be guilty of no more than simple assault[.]
Id. at 707.
In the case at hand, however, Stigler was stabbed several times in the neck and hand with a pen. She had also been bitten on her face. The pen used by Simmons as a knife could have been deadly. Stigler's sister testified that:
 She had been badly beaten up. She was bleeding. Her hair was cut off and matted with blood. She was scratched and bleeding. Her clothes were torn off of her and her face was swelling, just swelling out, and it was — she had a big bruise in her face, and her face had swollen from one side and it had gotten almost twice the size of her face. Her face was almost twice the size on one side. [Emphasis added]
(T.III. 120) Thus, there was sufficient evidence to support an aggravated assault conviction.
Furthermore, not only did Stigler and her sister testify that her hair had been cut, but the police found a pair of scissors clipped to Stigler's purse. Thus, there was also sufficient evidence to support the simple assault conviction.
 IV. DID THE TRIAL COURT ERR IN REFUSING JURY INSTRUCTION D-3?
Jury Instruction D-3 reads as follows:
 The Court instructs the jury that if you find from the evidence that Gail Renee Simmons acted in self-defense in striking Hazel Stigler, then you are to return a verdict of not guilty.
(T.I. 40)
Simmons claims that the lower court erred in denying D-3. The lower court did, however, grant a self-defense instruction. Jury Instruction D-7 reads:
 The Court instructs the jury that to make an assault justifiable on the grounds of self-defense, the danger to the defendant must be either, actual, present and urgent, or the defendant must have reasonable grounds to apprehend a design on the part of the victim to do to her some great bodily harm, and in addition to this she must have a reasonable grounds to apprehend that there is imminent danger of such design being *Page 1203 
accomplished. It is for the jury to determine the reasonableness of the ground upon which the defendant acts.
 If you find from the evidence in this case that Gail Renee Simmons acted in self-defense then you should return a verdict of not guilty as to count III of the indictment, as to both Defendants.
(T.I. 37)
D-7 is similar to the instruction that this Court recommended in Robinson v. State, 434 So.2d 206 (Miss. 1983). D-7, however, limits self-defense to the aggravated assault charge. D-3 did not limit the claim of self-defense to any particular count in the indictment, but would have allowed Simmons to be found not guilty on all counts if the jury determined that she did act in self-defense.
The lower court correctly held, however, that there was no evidence that Simmons had acted in self-defense except with respect to the aggravated assault charge. In denying D-3, the judge stated:
 I am going to do this: As to Count III, being the aggravated assault charge, I will consider a self-defense instruction submitted consistent with Robinson v. State.
 As to Count IV and Count V, being simple assault charges, I'm going to deny self-defense instructions as to those charges for these reasons: If memory serves me correctly, number one, we must keep in mind that the Defendant Simmons is submitting or requesting a self-defense instruction. We must also further keep in mind that Defendant Simmons offered absolutely no proof. However, through the examination of Defendant Eldridge, she did testify as to what she observed surrounding the incident in Count III and how everything started. Obviously, that's in conflict with what Ms. Stigler said. But certainly, there's conflicting testimony in that regard surrounding the aggravated assault charge.
 However, as to Count IV, that is the charge where these defendants have been charged with simple assault by pointing a firearm at Hazel Alicia Stigler and threatening to shoot or kill her, the only testimony in that regard that we have is in the State's case in chief and primarily from Ms. Stigler. We have nothing from Ms. Simmons on this point. Ms. Eldridge denies clearly, as I recall, ever seeing a gun and even seeing — well, number one, she said certainly she didn't see a gun pointed at Ms. Stigler and didn't see Gail Renee Simmons point a gun at Ms. Stigler. In fact, she said she never saw a gun. So clearly, a self-defense instruction would not be proper as to Count IV because according to Ms. Eldridge that simply didn't happen or she didn't see it. And we hear nothing from Ms. Simmons on that point.
 As to Count V, the same situation. As I recall Ms. Eldridge's testimony, she denies seeing anybody cut Ms. Stigler's hair. She says she didn't do it, and she says that she didn't see Ms. Simmons cut Ms. Stigler's hair. So, clearly, self-defense instructions would not be proper there.
 As to Count III, I will consider a Robinson
instruction. I have a form, Mr. Jones, to save time that you could go by that should be verbatim to Robinson.
 For those reasons, D-3 I'm going to deny simply because it is not in compliance or conformity with Robinson. It simply is a three-line instruction . . . and as submitted, it does not inform the jury about what self-defense might be or anything like that.
(T.VI. 499-501)
From this record it is clear that there was no evidence to support the claim of self-defense except as to aggravated assault, and D-3 did not conform with Robinson, supra.
 V. DID THE TRIAL COURT ERR IN GRANTING JURY INSTRUCTIONS S-2S(A) AND S-4S?
Jury Instruction S-2S(a) reads:
 The Court instructs the Jury that each person present at the time, and consenting to and encouraging the commission of a crime and knowingly, wilfully and feloniously doing any act which is an *Page 1204 
element of the crime, or immediately connected with it, or leading to its commission, is as much a principal as if she had, with her own hand, committed the whole offense; and if you believe from the evidence, beyond a reasonable doubt, that the Defendant GAIL RENEE SIMMONS, did wilfully, knowingly, unlawfully and feloniously do any act which is an element of the crime of Kidnapping or Aggravated Assault or Simple Assault, or immediately connected with any one of these crimes, or leading to its commission, then you shall find the Defendant, GAIL RENEE SIMMONS, guilty of Kidnapping or Aggravated Assault or Simple Assault or any one or all of these crimes. [Emphasis added]
(T.I. 27)
Simmons contends that this instruction misled the jury and was not supported by the evidence. Furthermore, the instruction implies that the jury could convict her if only one element of the crime charged was proven. Simmons argues that this is reversible error since all elements of a crime must be proven beyond a reasonable doubt.
S-2S(a), however, is similar to the aiding and abetting instruction approved by this Court in Kelly v. State,493 So.2d 356, 359 (Miss. 1986). Also, Jury Instructions S-4S and S-6S instructed the jury that the State had to prove every element of the crime beyond a reasonable doubt. Thus, the jury was properly instructed when the instructions are read together. Gray v.State, 487 So.2d 1304, 1307 (Miss. 1986).
Furthermore, the charges of kidnapping, aggravated assault, and simple assault were supported by evidence presented at trial.
Jury Instruction S-4S reads:
 The Defendant, GAIL RENEE SIMMONS, has been charged with the crime of Aggravated Assault in Count 3.
 If you find from the evidence in this case, beyond a reasonable doubt, that on June 30, 1987, GAIL RENEE SIMMONS did recklessly cause serious bodily injury to Hazel Alicia Stigler by biting Hazel Alicia Stigler on her cheek and puncturing Hazel Alicia Stigler's face, neck and hands with a pen, under circumstances manifesting extreme indifference to the value of human life, then you shall find the Defendant, GAIL RENEE SIMMONS, guilty of Aggravated Assault in Count 3.
 If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the Defendant, GAIL RENEE SIMMONS, not guilty of Aggravated Assault in Count 3.
(T.I. 28)
Simmons contends that this jury instruction is not supported by the evidence. Stigler, however, testified to the stabbing and biting, and she introduced photographs of the wounds. (Ex. 3-1, 3-2) Thus, there was evidence introduced to support the instruction.
 VI. DID THE TRIAL COURT ERR IN RESTRICTING ELDRIDGE'S TESTIMONY?
The lower court sustained the State's objection to certain testimony that the defense attempted to elicit from Eldridge. Simmons claims that the restriction of Eldridge's testimony constitutes reversible error. The testimony in question reads as follows:
 Q: You had known her since second grade. Do you know Hazel Stigler's reputation for truth and veracity in the community in which she lives?
 A: Yes, I do, sir.
 Q: What is that reputation?
 A: It's bad.
 Q: Now, what do you mean by "bad" reputation?
 MR. KELLY:
 Objection, Your Honor. He's gone as far as he can go.
 THE COURT:
 I'll sustain the objection.
 Q: (By Mr. Carlton) Let me ask you this, then, Ms. Eldridge: Would you believe Hazel Stigler under oath? *Page 1205 
 MR. KELLY:
 Objection, Your Honor. He's gone as far as he can go on that particular issue.
 THE COURT:
 I'll sustain the objection.
(T.V. 363-364)
The jury was given a brief recess to allow the defense to make the following offer of proof:
 Q: All right. I asked you if you knew Hazel Stigler's reputation for truth and veracity in the community and you said that you did; is that right?
 A: Yes.
 Q: And I also asked you what that reputation was, and you said that it was bad?
 A: Yes, sir.
 Q: And I believe there was another question to which an objection was sustained, and then I asked you would you believe her under oath, and there was an objection. What would your answer be to that question?
 A: No.
 MR. JONES:
 Your Honor, for the record, on behalf of my client, Ms. Simmons, I would join in that offer of proof. Since the Court sustained that objection, we didn't want to have to go back through it again, and this is what she would have said if it had been allowed before the jury. Of course, we think it should have been, but we both make this offer of proof.
 THE COURT:
 It's in the record, but, again, of course, the objection was made and sustained, and I think it's clear from the case law and the well established guidelines on this line of questioning as to how far the examiner may go whether it be the prosecutor or the defense attorney; that to ask whether or not — well, first of all, to establish, really, that the witness does know the person whose character might be under attack and to establish that relationship with that person and then ask the witness whether or not the witness has an opinion or whether or not the witness knows the reputation of the particular person for truth and veracity in the community, and if the witness responds yes, then the examiner may ask, "Is that reputation good or bad?" And then the witness may respond either good or bad. In this instance Ms. Eldridge went through that line of questioning, and when we got to that point regarding the reputation of Ms. Stigler in the community for truth and veracity, Ms. Eldridge stated that Ms. Stigler's reputation for truth and veracity was bad. That, I think, is as far as the case law permits the questioning to go. That evidence was allowed in and, number one, to allow the examination to go further regarding letting Ms. Eldridge respond to the question as to whether or not she would believe Ms. Stigler under oath, number one, that goes beyond the procedure set up by case law. Number two, obviously, it's the jury's function to determine whether or not it will believe any witness under oath and not to have to rely on so-called opinion testimony of a lay witness as to whether or not they would believe any particular witness under oath. So, anyway, those were the reasons for sustaining the objection.
(T.V. 397-399)
Simmons claims that Eldridge should have been allowed to testify that she would not believe Stigler under oath.
 When a witness is produced to impeach the character of another by general evidence affecting the character of the latter for veracity, he should be asked and compelled to answer, as a preliminary matter, whether or not he knows the general reputation of the person for truth and veracity in the community or neighborhood in which he resides or has resided. [citations omitted] If he answers in the negative his examination on that topic should close. If he answers in the affirmative, he may be examined further as to whether the general reputation of the person is good or bad, and whether from such general reputation *Page 1206 he would believe the person under oath, and the sources and extent of the information of the witness may be tested by cross-examination. [Emphasis added]
French v. Sale, 63 Miss. 386, 393 (1885).
 Form of questions:
 The witness should be asked and compelled to answer, as a preliminary matter, whether or not he knows the general reputation of the person for truth and veracity in the community or neighborhood in which he resides or has resided.
 If he answers in the negative, his examination of that topic should close. The witness should answer the question yes, or no. If the witness's answer is in the affirmative, he may be examined further as to whether the general reputation of the person is good or bad.
 Belief under oath:
 In case the witness answers in the affirmative that the reputation is good or bad, the witness may further be asked: Whether from the such general reputation of the witness he would believe the person under oath? He may answer this question yes or no. [Emphasis added]
McElroy's Miss.Evid., § 185.
This area of the law is now controlled by the Mississippi Rules of Evidence effective January 1, 1986. Rule 608 reads in part:
 (a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.
Eldridge was allowed to testify that Stigler's reputation for truth and veracity was bad. The lower court's restriction of Eldridge's testimony as to whether Stigler could be believed under oath, while erroneous, was harmless.
There is no merit to the remaining assignment of error. The judgment of conviction is affirmed.
CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED, AND CONVICTION OF SIMPLE ASSAULT AND SENTENCE OF SIX (6) MONTHS IN THE DESOTO COUNTY JAIL AFFIRMED.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, ANDERSON and PITTMAN, JJ., concur.
BLASS, J., DAN M. LEE, P.J., and SULLIVAN, J., dissent.
[1] This statute has been in effect since the Code of 1892, § 1334. Article 244, Chapter 64 of the Code of 1857 has the same wording except the final clause which states "where indictment
shall be first found." [Emphasis added]