# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-01041-SCT

*JAMES DOUGLAS WILLIE a/k/a JAMES D. WILLIE a/k/a JAMES WILLIE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/05/2014 |
| TRIAL JUDGE: | HON. JAMES McCLURE, III |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: JUSTIN TAYLOR COOK |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALICIA MARIE AINSWORTH |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 12/08/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1. A Panola County jury convicted James Douglas Willie of deliberate design murder. He now appeals the conviction and raises the following issues: (1) that the trial court erred in allowing the State's ballistic expert to give definitive testimony matching bullets from the crime scene to a gun linked to Willie; (2) that his trial counsel provided ineffective assistance by failing to object to the ballistics testimony; (3) that the jury returned a guilty verdict

against the overwhelming weight of the evidence; and (4) that the trial court improperly answered a question submitted by the jury. We hold that the judge erred in answering a question posed by the jury during deliberations and reverse Willie's conviction and remand the case to the trial court for further proceedings.

**FACTS**

¶2. Nebraska resident Tom Schlender, age seventy-four, was killed while traveling on U.S. Interstate 55 (I-55) through Panola County, Mississippi, to pick up his grandson at a Bible college in Pensacola, Florida. Trooper Robert Anderson of the Mississippi Highway Patrol discovered Schlender's body. Anderson testified that he received a call at 1:46 a.m. on May 8, 2012, to work a one-vehicle accident on I-55 near the Pope-Courtland exit. He arrived at 2:07 a.m. and observed a red Ford pickup truck in the southbound lane with its driver's side against the guardrail in the median. The truck's doors were closed. Anderson opened the passenger's-side door to talk to the driver, who was bloodied and had no pulse. Anderson noticed that the truck's engine was running and the transmission was in drive.

¶3. Kit Wingert, a crime scene analyst with the Mississippi Bureau of Investigation, processed the crime scene. Wingert testified that the driver/victim had apparent gunshot wounds to his right hand, front left shoulder, back left shoulder, and the right side of his body. He testified that the truck's front passenger's-side and driver's-side windows were broken out and there was a projectile defect on the passenger's-side mirror. Five bullet holes were in the post between the driver's-side door and the back door; two of the bullets had penetrated into the cab. Four nine-millimeter shell casings were found on I-55 several

2

hundred feet north of the truck's resting place. Wingert collected a projectile and projectile fragments from several places inside the truck. He testified that the projectiles had come from the driver's side of the truck. The medical examiner testified that he had identified five gunshot wounds to Schlender, including one close-range wound to the left shoulder. The medical examiner removed a bullet from Schlender's right shoulder and a loose bullet from the body bag in which he received Schlender's body.

¶4.     Albert Perkins of the Panola County Sheriff's Department testified that Willie's mother lived about two and a half miles from the Pope-Courtland exit. Candace Rattler testified that she had been in a burgundy Chevrolet automobile with Willie in Tunica County, Mississippi, on May 15, 2012. Rattler testified that Willie had a gun with him and fired it twice before putting it in the glove compartment. Rattler could not identify Willie in the courtroom and testified that, in May 2012, Willie was heavyset and had braids. The State called Bernadette Logan, a detective with the Tunica County Sheriff's Department. Logan testified that, in May 2012, Willie had been heavyset with braids, but since that time he had lost a substantial amount of weight and had changed his hairstyle.

¶5.     Logan testified that, after talking with Rattler, she had recovered two nine-millimeter shell casings from Johnson's Bottom Road in Tunica County. Another detective testified that he had found a burgundy Chevrolet vehicle at Willie's apartment with a black, nine-millimeter, Ruger pistol in the glove compartment. The gun was unloaded, but a loaded clip was found over the driver's-side sun visor.

¶6.    Cedric Davis of the Tunica County Sheriff's Department testified that he had interviewed Willie on May 15, 2012. Davis testified that, at that time, Willie was heavier and wore two dreadlocks. Davis said that Willie had told him that the gun had been in his possession for approximately two weeks and that he had purchased it for his protection.

¶7.    Brian McIntire, a forensic analyst with the Mississippi Crime Laboratory, was accepted as an expert in forensic firearm identification. McIntire testified that he had examined the gun, the four shell casings found on I-55, the bullet and fragments found in the truck's cab, the two shell casings from Tunica County, and the bullets submitted by the medical examiner. McIntire further testified that, in his expert opinion, the four shell casings found on I-55 were fired in the gun, two projectiles from the truck's cab were fired in the gun, the two bullets collected by the medical examiner were fired in the gun and the two shell casings from Tunica County were fired in the gun. He testified that some of the projectile fragments collected from the truck's cab had the same class characteristics as the gun, but he was unable to identify them positively as having been fired in the gun.

¶8.    McIntire also testified about the methodology he used to reach his conclusions. He explained that, first, he test-fired the gun in the laboratory to produce test-fired bullets. He then examined the "test fires" to become familiar with their class characteristics and individual characteristics. McIntire testified that "class characteristics" are the characteristics common to all firearms with the same model number and that the Ruger's class characteristics were nine-millimeter caliber, six lands and grooves, and a right-hand twist. McIntire testified that individual marks or striations are left on the bullet and cartridge case

4

when a gun is fired, and that the "individual characteristics" are unique to a specific firearm. By using a comparison microscope to compare the individual characteristics of the test fires to the individual characteristics of the bullets associated with the crime, he said he was able to determine whether a particular projectile or shell casing was fired from a particular weapon. His results were reviewed by another firearms identification expert at the Mississippi Crime Laboratory.

¶9. Willie did not challenge McIntire's qualifications or his conclusions. He presented no opposing expert testimony. On cross-examination, defense counsel asked whether McIntire had a margin of error for his results. McIntire responded that he had no margin of error but admitted that he is not infallible.

¶10. Willie testified and denied that he had killed Schlender. He testified that he had purchased the gun "off the streets" in Memphis, Tennessee, for his protection. He admitted that he had told investigating authorities that he had purchased it approximately two weeks before he was questioned, but he stated that the word "approximately" meant that he could have had it for days, weeks, or months. On cross examination, Willie testified that he had bought the gun on May 13, 2012, after the murder. Indeed, his defense at trial had nothing to do with challenging the State's assertion that the gun in question was the murder weapon. Instead, he testified that he did not possess the gun until after the crime, and that the real murderer must have sold the gun after committing the murder.

**DISCUSSION**

5

I. Whether the trial court erred in allowing the State's ballistics expert to testify that the shell casings and bullets were fired by the gun recovered from the car belonging to Willie's girlfriend.

¶11. Willie argues that the trial court erred in permitting McIntire to testify conclusively that the shell casings and bullets came from Willie's gun. Willie argues that McIntire should have been allowed to testify only that the bullets and shell casings were consistent with having been fired from the pistol. He further contends that McIntire's testimony should have been so limited because a consensus exists within the scientific and legal communities that bullets and shell casings cannot be matched to a specific firearm with absolute certainty.

¶12. Mississippi Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

M.R.E. 702. Under Rule 702, expert testimony must be both relevant and reliable. *Corrothers v. State*, 148 So. 3d 278, 294 (Miss. 2014); *see Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Under the relevance prong, the evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (quoting *Daubert*, 509 U.S. at 591, 113 S. Ct. 2786). Testimony is reliable when it is 'based upon sufficient facts or data,' is 'the product of reliable principles and methods,' and when 'the witness has applied the principles and methods reliably to the

facts of the case.'" ***Corrothers***, 148 So. 3d at 294 (quoting M.R.E. 702). The court may consider the nonexaustive factors to assess reliability: "whether the expert's theory can be or has been tested; whether the theory has been the subject of peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence of standards to control the technique's operation; and the general acceptance the theory has garnered in the relevant expert community." ***Flowers v. State***, 158 So. 3d 1009, 1030 (Miss. 2014), *cert. granted, judgment vacated on other grounds,* 136 S. Ct. 2157 (2016). The trial court's focus in assessing reliability must be on principles and methodology, not on the conclusions generated. ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 36-37 (Miss. 2003). The trial court's role concerning expert testimony is that of gatekeeper: "it must make a preliminary assessment regarding the scientific validity of the reasoning or methodology underlying the expert testimony and the proper application of that reasoning or methodology to the facts of the case at issue." ***Union Carbide Corp. v. Nix, Jr.,*** 142 So. 3d 374, 388 (Miss. 2014). The Supreme Court reviews the trial court's admission or exclusion of expert testimony for abuse of discretion. ***Corrothers***, 148 So. 3d at 295.

¶13. Willie contends that McIntire's testimony matching the bullets and shell casings to the gun associated with Willie was unreliable because the science of forensic firearm and toolmark identification does not permit identifications to be made with absolute certainty. However, Willie did not object to McIntire's testimony. A party who believes expert testimony to be inadmissible is required to make a timely objection to the admission of such

7

testimony into evidence. *Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 755 (Miss. 2011). According to Mississippi Rule of Evidence 103(a)(1):

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context . . . .

M.R.E. 103(a)(1). If the complaining party fails to object to expert testimony, then error predicated on its admission is procedurally barred from consideration on appeal. *Brown v. State*, 890 So. 2d 901, 915 (Miss. 2004). Willie did not object to McIntire's testimony; therefore, the issue is procedurally barred.

> II. Whether Willie's trial counsel rendered constitutionally ineffective assistance of counsel in failing to object to the testimony of the State's ballistics expert.

¶14. As we hold above, the failure of Willie's trial counsel to object to the ballistics testimony bars the issue from consideration on appeal. Willie next argues that the failure of his trial counsel to object amounts to ineffective assistance of counsel in violation of his constitutional right to counsel. We disagree.

¶15. Both the United States Constitution and the Mississippi Constitution provide a defendant a right to the effective assistance of counsel. U.S. Const. amends. VI, XIV; Miss. Const. art. 3, § 26; *Strickland v. Washington*, 466 U.S. 668 (1984). To prove deficient performance, the defendant must show that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. There is a strong presumption that counsel's performance fell "within a wide range of reasonable professional assistance" and was the

8

product of sound trial strategy. *Id.* at 689. However, counsel's performance must have been reasonable considering the totality of the circumstances. *Id.* at 688. An evaluation of the reasonableness of counsel's conduct must be made "on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. To succeed on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

¶16.   In *Neal v. State*, 15 So. 3d 388 (Miss. 2013), the defendant, Jermaine Neal, argued on appeal that, among other things, his trial attorney's failure to object to hearsay testimony rendered his performance constitutionally defective. The *Neal* Court rejected his argument, writing, "Neal's assertions that defense counsel failed to object to hearsay and jury instructions and failed to make timely objections are all protected as within the realm of trial strategy." *Id.* at 406 (¶ 43). The *Neal* Court continued, "The decision to 'make certain objections fall[s] within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim.'" *Id.* (quoting *Spicer v. State*, 973 So. 2d 184, 203 (Miss. 2007) (quoting *Powell v. State*, 806 So. 2d 1069, 1077 (Miss. 2001))).

¶17.   After a George County jury convicted him of capital murder and sentenced him to death, Fred Spicer sought post-conviction relief in *Spicer v. State*, 973 So. 2d 184 (Miss. 2008). Spicer contended that his trial counsel rendered ineffective assistance due to a failure to object to the prosecutor's closing argument during the sentencing phase of the trial. The prosecutor argued as follows:

> He is either going to die in prison, which is a death penalty, and the State is
> going to support him forth [sic] the next 50 years until he dies, with our tax

dollars, or he will die sooner. Either way, it's a death penalty. And I submit to you, why should he be allowed to sit for the next 50 years and watch TV and have friendships and to have associations and to have hope and to have all the things that living people have when Edmond Hebert is dead?

*Spicer*, 973 So. 2d at 203. Citing the principle that decisions regarding objections at trial fall within the "ambit of trial strategy," the *Spicer* Court held Spicer's argument to be meritless.

¶18.    In *Cole v. State*, 666 So. 2d 767 (Miss. 1995), the Court rejected the defendant's contention that counsel had been ineffective for failing to object to certain testimony. *Id.* at 777. The Court noted that the decision not to object could have been based in a desire not to draw unwanted attention to the testimony in question. *Id.* The same could be said of the decision of Willie's counsel not to object, or it could be that counsel did not want to give the State an opportunity to rephrase the question into the stronger-sounding, correct form.

¶19.    Relying on *Neal*, *Spicer*, and *Cole*, we hold that the decision not to object to the form of the prosecutor's questions to the State's expert falls within the scope of trial strategy and did not constitute defective representation.

> III.    Whether the jury returned a guilty verdict against the overwhelming weight of the evidence.

¶20.    Willie next contends that the jury's verdict was against the overwhelming weight of the evidence. Appellate review of the denial of a motion for a new trial based on the weight of the evidence requires the Court to view the evidence in a light most favorable to the verdict, and the verdict will be disturbed only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d at 844 (¶18) (citation omitted)). Further, "[a] reversal on the

10

grounds that the verdict was against the overwhelming weight of the evidence . . . 'does not mean that acquittal was the only proper verdict.'" *Id.* (quoting *McQueen v. State*, 423 So. 2d 800, 803 (Miss. 1982)). A new trial should be granted only in "exceptional cases in which the evidence preponderates heavily against the verdict." *Smith v. State*, 925 So. 2d 825 (Miss. 2006) (citing *Bush*, 895 So. 2d at 844).

¶21. Willie argues that the verdict is against the overwhelming weight of the evidence because the testimony of the ballistics expert was improper. His contention amounts to nothing more than an attempt to demonstrate error on a matter as to which he failed to object at trial.

> Raising objections in a motion for new trial which should have been made at trial has never been thought to cure the failure to object at the proper time. *Barnett v. State*, 725 So. 2d 797, 801 (Miss. 1998). It is axiomatic that a litigant is required to make a timely objection. *Id.* We have repeatedly held that if no contemporaneous objection is made, the error, if any, is waived. *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995) (citing *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994)). This rule's applicability is not diminished, even in a capital case. *Id.*

*Smith v. State*, 797 So. 2d 854, 856 (¶ 7) (Miss. 2001). The issue is without merit.

IV. Whether the trial court erred in answering a question from the jury.

¶22. During deliberations, the jury submitted a note to the trial judge asking, "Sir, can we say he is guilty of having the gun without saying he is guilty of murder." The trial judge responded by writing, "No," on the note and sending it back to the jury. The only charge against Willie at trial, and the only charge as to which the jury was instructed and could have found him guilty, was deliberate design murder. No second gun charge was lodged against Willie. On appeal, Willie contends that the trial judge's response equates to a peremptory

11

instruction if the jury found Willie guilty of a gun charge. He contends that the judge's response to the jury's question amounted to instructing the jury that no, it could not find Willie possessed the gun without also finding him guilty of murder.

¶23. Rule 3.10 of the Uniform Rules of Circuit and County Court Practice provides as follows:

> If the jury, after they retire for deliberation, desires to be informed of any point of law, the court shall instruct the jury to reduce its question to writing and the court in its discretion, after affording the parties an opportunity to state their objections or assent, may grant additional written instructions in response to the jury's request.

Accordingly, we review the trial judge's additional written instructions in response to a question from the jury for an abuse of discretion. *See also **Galloway v. State***, 122 So. 3d 614, 634 (¶ 36) (Miss. 2013). Unless the trial judge based his response to the note on an incorrect interpretation of the law, we may not reverse for an abuse of discretion unless the trial court's handling of the matter was arbitrary and clearly erroneous. ***Galloway***, 122 So. 3d at 634 (¶ 36). As more fully developed below, the trial judge's response incorrectly interpreted the law, in that it allowed the jury to find Willie guilty of murder if the jury believed him "guilty" of possessing the gun.

¶24. In appeals involving notes from juries, we often quote ***Girton v. State***, 446 So. 2d 570 (Miss. 1984), in which the Court wrote the following:

> One of the most nettlesome problems faced by a circuit judge is an inquiry from the jury when it has retired to reach its verdict. The ensuing colloquy between the judge and jury, or instruction resulting therefrom, or both, have been one of the grounds of many appeals to this Court.

We really cannot lay down hard and fast legal principles to govern the myriad circumstances in which a problem may arise.

The patient and attentive judge has heard the evidence, following which he has diligently endeavored to instruct the jury on every possible relevant aspect of the case to guide this body in its deliberations. Having done so, and while he, the parties, and their counsel await the verdict, the judge is called upon to answer some question a juror has about the case.

What is he to do? In deference we offer some common sense suggestions.

Our first recommendation is that the circuit judge determine whether it is necessary to give any further instruction. Unless it is necessary to give another instruction for clarity or to cover an omission, it is necessary that no further instruction be given.

Of course, a circuit judge may realize such a necessity even in the absence of an inquiry from the jury, and under such circumstances quite properly may give the jury additional written instructions. *See **Wages v. State***, 210 Miss. 187, 49 So. 2d 246 (1950).

The second recommendation requires the trial judge to constantly bear in mind that justice in every trial requires communication and understanding. Unless words are clearly understood, there is only a communication of sound, or worse, a distinct possibility of the receiver of the information placing a different meaning on what is spoken or written than the author meant. This is critical in any communication from the circuit judge to the jury, or between the judge and jury.

Therefore, a judge should make absolutely certain he understands precisely what is meant in any inquiry from the jury. Unless he is quite certain precisely what the jury means in its inquiry, how can the judge know he is responding properly?

*Girton*, 446 So. 2d at 572-573. The conversation between the trial judge, the district attorney

(Champion), and defense counsel (Walker), upon receipt of the note, was brief and went as

follows:

13

THE COURT: All right. I got a note from the jury and the jury has a question. And it says, "Sir, can we say he is guilty of having the gun without saying he is guilty of murder?"

So, I'm going to respond, "No, you cannot," and send it back.

Mr. Walker?

MR. WALKER: Well, Judge, that would be a lesser included charge, possession of a firearm by a felon.

MR. CHAMPION: They – there's no proof in front of them of that.

THE COURT: Well, there's been –

MR. CHAMPION: Plus, they have no –

THE COURT: – no lesser included instruction, no – I mean, this is simple murder –

MR. WALKER: I understand, Judge.

THE COURT: – and it's going to be either a guilty or not guilty or hung jury.

MR. CHAMPION: I think the response will be, "You must find him either guilty or not guilty of murder."

THE COURT: Okay. I'm just going to say, No, you cannot. You can just either – murder – you know, guilty or not guilty. Okay. (Wrote on note.)

One word response, "No." I figured the more I write, the more I'll confuse them.

All right. Pee Wee, if you'll hand that back to them.

BAILIFF JOHNSON: All right, sir.

¶25. Like the *Girton* Court, we cannot be sure what the jury meant by its question. *Girton*, 446 So. 2d at 573 ("While this Court believes we have some understanding of what was troubling this juror, we must at the same time concede we are not sure.") While the trial

14

judge and attorneys quickly veered into a discussion of whether a conviction for possession of the gun was possible, the communication from the jury was open to another reasonable interpretation. Willie argues that the jury was asking whether it could acquit him of murder if it believed he possessed the gun, and that the one-word answer of the trial judge resulted in an instruction to the jury to the effect that, "No, you cannot find he possessed the gun without also finding he is guilty of murder." Such an instruction would clearly be contrary to the law, as possession of a gun does not amount to being guilty of deliberate design murder. It also would contradict the jury instruction that properly instructed the jury as to the elements of deliberate design murder. The jury heard Willie's testimony, outlined above, that he came into possession of the gun after the murder. Perhaps the jury believed he possessed the murder weapon but hesitated to find he possessed it at the time of the murder, and the jury's question was born of a tension between believing the former and doubting the latter. If so, the judge's response may well have persuaded jurors to vote to convict based on their belief that Willie possessed the gun used in the crime.

¶26. The State, on the other hand, argues that the issue is barred by Willie's failure to object at trial and otherwise lacks merit because Willie was not on trial for possessing the firearm. The State argues that any further response from the trial court would have confused the jury, as it indeed was not possible for the jury to convict Willie of possessing the gun. The State further contends that the jury instructions read as a whole properly instructed the jury.

15

¶27. As the case appears via the record on appeal, either interpretation of the intent behind the jury's question – Willie's or the State's – is possible. Ironically, the trial court's and the attorneys' focus on the possibility that the jury wanted to consider a conviction for possession of a firearm and an acquittal for murder originated with Willie's trial counsel, who spoke first after the trial judge read the question to the attorneys. Willie's attorney suggested that possession of a firearm would be a lesser included offense, which in turn caused the trial court and prosecutor to discuss the absence of any such charge against Willie. After the discussion of the lesser-offense possibility ended, and the judge indicated he would respond with a simple, "No," no one present discussed the possible effect, raised today, that the jury would take the judge's response to indicate that a finding of possession of the firearm would necessitate a conviction for murder.

¶28. Because Willie's counsel failed to object to the judge's response, the issue is barred from review absent plain error. *See Fitzpatrick v. State*, 175 So. 3d 515, 522 (¶ 31) (Miss. 2015) ("A defendant's failure to object to a jury instruction at trial creates a procedural bar that prohibits appellate review of the issue, unless there is plain error."); *see also Holliman v. State*, 178 So. 3d 689, 700 (¶ 24) (Miss. 2015); *Walker v. State*, 729 So. 2d 197, 202 ( ¶ 19) (Miss. 1998).

¶29. We apply the plain-error rule only if "a defendant's substantive or fundamental rights are affected." *Foster v. State*, 148 So. 3d 1012, 1018 (¶ 20) (Miss. 2014) (quoting *Grayer v. State*, 120 So. 3d 964, 969 (Miss. 2013)). Applying the plain-error rule, the Court must determine: (1) whether the trial court deviated from a legal rule; (2) whether the error is

plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. *Id.* Only if the error "resulted in a manifest miscarriage of justice" will reversal occur. *Foster*, 148 So. 3d at 1018 (¶ 20) (quoting *Williams v. State*, 134 So. 3d 732, 736 (Miss. 2014)).

¶30. We have held that it is plain error to allow a jury instruction that permits the jury to find a defendant guilty for reasons other than guilt as to every element of the underlying crime. *Berry v. State*, 728 So. 2d 568, 571 (¶ 6) (Miss. 1999). In *Berry*, the defendant, Merlinda Berry, stood convicted of the transfer of cocaine. *Id.* at 569 (¶ 2). Among other issues on appeal, she contended that the instruction to the jury on the definition of accessory allowed the jury to return a guilty verdict even if it did not find her guilty of every element of the crime for which she was convicted. *Id.* at 571 (¶ 5). The instruction in question read as follows:

> The Court instructs the jury that each person present at the time, and consenting to and encouraging the commission of a crime, and knowingly, willfully and feloniously doing any act which is an element of the crime, or immediately connected with it, or leading to its commission, is a principal.
>
> One who aids, assists and encourages a transfer of cocaine is a principal and not an accessory, and his guilt in nowise depends upon the guilt or innocence, the conviction or acquittal of any other alleged participant in the crime. Therefore if you believe from the evidence, beyond a reasonable doubt, that Merlinda Berry did willfully, unlawfully and feloniously do any act which is an element of the crime of transfer of cocaine, as defined by the Court's instructions, or immediately connected with it, or leading to its commission, then and in that event, you should find Merlinda Berry guilty of transfer of cocaine as charged in the indictment.

*Id.* at 570 (¶ 4). In *Berry*, the State – as does Presiding Justice Randolph in his separate opinion – responded that other instructions instructed the jury as to the elements of the crime. *Id.* at 571 (¶ 5).

17

¶31.    The **Berry** Court acknowledged two other cases, **Simmons v. State**, 568 So. 2d 1192 (Miss. 1990), and **Hornburger v. State**, 650 So. 2d 510 (Miss. 1995), involving similar accessory instructions, in which the Court affirmed the convictions because other instructions informed the jury of the requirement that it find the defendants guilty of each element of the crime.  **Berry**, 728 So. 2d at 571 (¶¶ 7-8).  However, the **Berry** Court – again reviewing the issue for plain error – reached the opposite result and reversed Berry's conviction.

> In this case, however, we find that reading the instructions as a whole did not cure the error resulting from the improper instruction.  The jury was in fact informed of the elements of transfer of cocaine and the State's burden of proof in this case in instructions other than S-3.  The problem with the offending instruction is that it appears to give the jury an additional option of finding the defendant guilty if she committed only one element of the crime without even finding that the crime was ever completed.  Even if the jury read all of the instructions together, they could still be misled into believing that Instruction S-3 was merely another option in addition to the choice of finding that Berry committed all of the elements of the crime herself.  We find that the instruction on an accessory in this case was confusing and misleading, and therefore requires reversal.  **Brazile v. State**, 514 So. 2d 325, 326 (Miss. 1987) ("inaccurate and confusing nature" of instruction requires reversal and remand for a new trial).

**Berry**, 728 So. 2d at 571 (¶ 9).

¶32.    **Simmons v. State**, 568 So. 2d 1192 (Miss. 1990), included, *inter alia*, an argument from the defendant that an aiding-and-abetting instruction given the jury implied that the jury could convict the defendant if the State proved only one element of the principal crime.  **Id.** at 1204.  The instruction at issue read as follows:

> The Court instructs the Jury that each person present at the time, and consenting to and encouraging the commission of a crime and knowingly, wilfully and feloniously doing *any act* which is an element of the crime, or immediately connected with it, or leading to its commission, is as much a principal as if she had, with her own hand, committed the whole offense; and

18

if you believe from the evidence, beyond a reasonable doubt, that the Defendant GAIL RENEE SIMMONS, did wilfully, knowingly, unlawfully and feloniously do any act which is an element of the crime of Kidnapping or Aggravated Assault or Simple Assault, or immediately connected with any one of these crimes, or leading to its commission, then you shall find the Defendant, GAIL RENEE SIMMONS, guilty of Kidnapping or Aggravated Assault or Simple Assault or any one or all of these crimes.

*Id.* at 1203-1204. The ***Simmons*** Court affirmed the conviction and, in doing so, noted that other instructions informed the jury of the State's burden to prove every element of the crime.

*Id.*

¶33. In the later case ***Hornburger v. State***, 650 So. 2d 510 (Miss. 1995), the Court again affirmed a conviction despite an aiding-and-abetting instruction that "implied that the jury could convict her if only one element of the crime charged was proven." *Id.* at 515. The instruction in ***Hornburger*** read as follows:

The Court instructs the Jury that each person present at the time, and consenting to and encouraging the commission of a crime, and knowingly, willfully and feloniously doing any act which is an element of the crime or immediately connected with it, or leading to its commission, is as much a principal as if he had with his own hand committed the whole offense; and if you find from the evidence beyond a reasonable doubt that the defendant, Gregory Hornburger, a/k/a Greg Hornburger, did willfully, knowingly, unlawfully and feloniously do any act which is an element of the crime of burglary of a building, or leading to its commission, then and in that event, you should find the defendant guilty as charged.

*Id.* at 514. Although, like the ***Simmons*** Court, the ***Hornburger*** Court affirmed the conviction, unlike the ***Simmons*** Court, the ***Hornburger*** Court held the trial court erred in giving the instruction at issue. *Id.* at 515. However, the Court, citing other jury instructions that required the jury to find the defendant guilty of each element beyond a reasonable doubt, held the error had been harmless. *Id.*

19

¶34.    In another, later case styled ***Liggins v. State***, 726 So. 2d 180 (Miss. 1998), the Court

*reversed* a conviction because it agreed that the aiding-and-abetting instruction impermissibly

lessened the burden on the State.  In comparing the objectionable instruction in ***Liggins*** to

that in ***Hornburger***, the court wrote:

> Identifiable differences exist between the two instructions.  In ***Hornburger***, the jury was charged that if the requirements of the instruction were met, it normatively "should" find the defendant guilty.  In the instant case, the jury was charged that it "shall" find Liggins guilty.  Further, ***Hornburger***'s instruction required consent to be deemed a principal and found guilt to derive from an act which is an element of or leads to the commission of the crime.  On the other hand, the instant case's instruction did not require consent for principal status while it deemed guilt to stem from an act immediately connected with the crimes, as well as an act which is an element of or leads to the commission of those crimes.
>
> Both instructions are objectionable in their effect.  In ***Hornburger***, it was pointed out that "[instruction S-8] basically says if you find [the defendant] did any act which is an element of the crime of burglary, you shall find [the defendant] guilty as charged."  ***Hornburger***, 650 So. 2d at 514.  As Liggins objected at trial, S-3 "lessens the burden of the State to prove every element of a crime by suggesting that if they can show any act which is an element of the crime, then the instruction directs them to find the defendant guilty."  Liggins basically argued that the State must simply show an act which is an element of the crime, rather than prove every element, to require a jury to find a defendant guilty.
>
> We found that the instruction in ***Hornburger*** was harmless error because of its sufficient sister instruction and because the term "should" was used as opposed to the "shall" utilized in the instant case.  Further, ***Hornburger***'s instruction required a greater burden on the state to prove the necessary elements, whereas the instant case's instruction, lessened the state's burden.  ***Hornburger*** is not this case.  It is reversible error in this case.

***Liggins***, 726 So. 2d at 184-185 (¶¶ 15-17).

¶35.    Like ***Berry***, ***Simmons***, and ***Hornburger***, the trial court in the case *sub judice*

instructed the jury on all of the elements of the crime.  However, the instant case is more like

20

***Berry***, and less like ***Simmons*** and ***Hornburger***, in that the trial judge's instruction to the jury in response to the jury's note gave the jury an "additional option" of finding Willie guilty of murder if the jury also thought him "guilty" of possessing a gun. Again, the trial judge's answer to the jury of "No," combined with the jury's question, effectively communicated to the jury that no, it could not find Willie "guilty" of having the gun without also finding him guilty of murder. Like the ***Berry*** Court before us, we hold the trial judge's supplemental instruction to the jury, in response to the jury's note, was "confusing and misleading, and therefore requires reversal." ***Berry***, 728 So. 2d at 571 (¶ 9). As in ***Liggins***, the judge's instruction to the jury (in the form of his response to their question) in the case *sub judice* lessened the burden on the State.

¶36.    In short, the judge's supplemental instruction in the case *sub judice*, like the troublesome instructions in ***Berry*** and ***Liggins***, did not leave a hole in the understanding of the jury that could be filled in by other instructions, but actually contradicted the other instructions to the jury. It should not have been suggested to the jury that they must find Willie guilty of murder if they found him "guilty" of possessing the gun, because – at the least – such an instruction contradicted the correct instruction informing the jury it must find him guilty of the elements of deliberate design murder. "When a jury is given instructions which are in hopeless conflict this Court is compelled to reverse because it cannot be said that the jury verdict was founded on correct principles of law." ***Scott v. State***, 446 So. 2d 580, 583 (Miss. 1984) (citing ***Pittman v. State***, 297 So. 2d 888 (Miss. 1974)); *see also **Stoop***

21

*v. State*, 531 So. 2d 1215, 1219 (Miss. 1988) (holding that the court, not the jury, properly decides which instructions correctly portray the law).

¶37. We pause for a moment here to reiterate the suggestion of the ***Girton*** Court, that trial judges confronted with a note from the jury do what they can to be sure they understand what the jury truly intends to ask. ***Girton***, 446 So. 2d at 572-573. While the defense attorney's immediate mention of gun possession as a lesser included offense appears to have distracted the judge and the prosecution from considering other possible meanings of the question, it is indeed another possible meaning of the question that leads to the uncertainty regarding the grounds for the jury's verdict and the reversal of Willie's conviction.

## CONCLUSION

¶38. Willie failed to object to the testimony of the State's ballistics expert and therefore is barred from raising its admissibility on appeal. The failure to object was a strategic decision; accordingly, it does not rise to the level of ineffective assistance of counsel. Because Willie did not object to the ballistics evidence, he cannot contend that his conviction is against the overwhelming weight of the evidence because the ballistics evidence comprised much of the evidence against him. However, because the trial court's supplemental instruction to the jury, given in response to the jury's note, allowed the jury to find Willie guilty of murder if the jury found he possessed the gun used in the murder, we reverse his conviction and remand the case for further proceedings consistent with this opinion.

¶39. **REVERSED AND REMANDED.**

**DICKINSON, P.J., AND LAMAR, J., CONCUR. KITCHENS, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY**

**KING, J. RANDOLPH, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., MAXWELL AND BEAM, JJ.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶40. While I agree with Justice Coleman's decision that this case must be reversed and remanded due to the improper supplemental jury instruction, I disagree with its conclusion that trial counsel's failure to object to the conclusory testimony of the State's firearms identification expert can be deemed trial strategy. Brian McIntire testified that the firearm in Willie's possession matched the projectiles and fragments in evidence. McIntire rendered these opinions in absolute terms, instead of to a reasonable degree of certainty in the field, as required by this Court's precedent. Because McIntire's testimony was the sole evidence linking Willie with Tom Schlender's murder, the failure to object was highly prejudicial. I would hold that trial counsel's failure to object to the conclusory nature of McIntire's firearm identification testimony constituted deficient performance that prejudiced Willie, violating his federal and state constitutional rights to the effective assistance of counsel. Therefore, I respectfully concur in part and in the result.

¶41. The United States Constitution and the Mississippi Constitution provide that a defendant has a right to the effective assistance of counsel. U.S. Const. amends. VI, XIV; Miss. Const. art. 3, § 26; *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To succeed on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. 2052.

23

¶42. The defendant bears the burden to show that counsel's performance was deficient because it "fell below an objective standard of reasonableness." *Id.* at 688, 104 S. Ct. 2052. A strong presumption exists that counsel's performance fell "within a wide range of reasonable professional assistance." *Id.* at 689, 104 S. Ct. 2052. Counsel's performance must have been reasonable considering the totality of the circumstances. *Id.* at 688, 104 S. Ct. 2052.

¶43. The defendant also must show that counsel's error adversely affected the defense. *Id.* at 692, 104 S. Ct. 2052. However, the defendant need not show that the error more likely than not changed the outcome of the case. *Id.* at 693, 104 S. Ct. 2052. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. 2052.

¶44. As a preliminary matter, I observe that this Court has held that claims of ineffective assistance of counsel generally should be raised during post-conviction proceedings. But we may address a claim of ineffective assistance of counsel on direct appeal if the issues presented are based on facts fully apparent from the record. M.R.A.P. 22(b); *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008). "[W]e 'may nevertheless reach the merits of the ineffectiveness issue where . . . the record affirmatively shows ineffectiveness of constitutional dimensions . . . .'" *Taylor v. State*, 167 So. 3d 1143, 1146 (Miss. 2015) (quoting *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983)). In this case, the issue of whether

Willie's counsel should have objected to McIntire's conclusory testimony is fully apparent from the record. That is because, in this instance, the Court can determine whether counsel rendered ineffective assistance by applying the law to the facts in the record, and no information outside the appellate record is necessary to make this determination.

¶45. I now address whether Willie has shown that trial counsel's failure to object to Brian McIntire's conclusory testimony was deficient performance. McIntire's exact testimony, in response to questioning on direct examination, that various shell casings, bullets, and fragments admitted into evidence had been fired in the handgun recovered from Willie, is informative in this regard.

¶46. With respect to the first of the four shell casings found on I-55, McIntire rendered the following testimony:

> Q. And were you able to form an expert opinion as far as that shell casing compared to that gun?
>
> A. I did.
>
> Q. And what is your expert opinion?
>
> A. The shell casing that is in State's Exhibit 25 was fired in the gun that is in State's Exhibit 43.

¶47. Regarding the second shell casing found on I-55, McIntire testified:

> Q. And what is your expert opinion?
>
> A. The shell casing that's in State's Exhibit 24 was fired in the gun in State's Exhibit 43.

¶48. McIntire testified as follows regarding the third shell casing from I-55:

> Q. What is your expert opinion, please?

25

A. The cartridge case in State's Exhibit 29 was fired in the gun in State's Exhibit 43.

¶49.    And, regarding the fourth shell casing found on I-55, McIntire testified:

Q. And what is your expert opinion?

A. The casing that is in State's Exhibit 30 was fired in the gun in State's Exhibit 43.

Q. So all four shell casings that were recovered on Interstate 55 were fired from that gun?

A. That's correct.

¶50.    McIntire also gave his opinion about the shell casings recovered in Tunica County:

Q. And the two shell casings that were recovered in Tunica County were fired from that gun?

A. That is correct.

¶51.    Next, the prosecutor asked McIntire about projectiles and fragments recovered from the victim's truck. Regarding a projectile collected from a rubber door seal inside the front driver's door, McIntire testified as follows:

Q. Okay. And were you asked to compare that item of evidence to this particular firearm?

A. I was.

Q. And were you able to form any kind of expert opinion as to whether or not that was fired from that particular gun?

A. Yes, sir.

Q. Okay. And what is your opinion?

26

A. The projectile that is in State's Exhibit 38 was fired in the gun in State's Exhibit 43.

Q. Okay. So this bullet recovered from inside the vehicle was fired in that gun?

A. That's correct.

¶52. Regarding a group of projectile fragments collected from inside the driver's-side rear door of the truck, McIntire testified as follows:

A. . . . The copper jacket fragments that were marked as 6E and 6F, both of those were fired in the gun in State's Exhibit 43.
The – so we've got G and H left. . . . The one that was labeled 6H, it was a copper jacket fragment and I was able to say that it beared [sic] the same class characteristics as the firearm in State's Exhibit 43 but I was not able to positively identify that one fragment as being fired in State's Exhibit 43.

¶53. Regarding a copper jacket fragment found on the floor of the truck, McIntire gave the following testimony:

Q. And were you able to form an expert opinion?

. . .

A. The copper jacket fragment that is in State's Exhibit 42 bears class characteristics consistent with the firearm in State's Exhibit 43. I could not positively identify it and – I could not positively include or exclude it as being fired in State's Exhibit 43 due to its mutilated condition and the lack of individual characteristics.

¶54. McIntire also rendered expert opinions about two projectiles collected by the medical examiner, stating:

Q. The last line of the medical examiner's label lists this as a bullet from right shoulder.

. . .

27

Q. And do you have an expert opinion as far as that exhibit is concerned?

. . .

A. The projectile that is in State's Exhibit 62 was fired in the gun in State's Exhibit 43.

Q. So the bullet found in Mr. Schlender's right shoulder was fired in that gun?

A. That's correct.

. . .

Q. All right. I'm going to finally hand you – which has crime lab 11, State's Exhibit 53. Okay. Where does that indicate that it came from?

A. The medical examiner's label lists the last line as a bullet from body bag.

. . .

Q. And do you have an expert opinion as far as that exhibit is concerned?

A. I do.

Q. And what is that expert opinion?

A. The bullet that is in State's Exhibit 53 was fired from the gun in State's Exhibit 43.

¶55. Then, the prosecutor embarked upon a final line of questioning that presented to the jury a summation of McIntire's expert opinions as follows:

Q. Brian, I know you – we've done a lot of asking questions and you've done a lot of answering questions. And just so we can clear this up for the jury, did you examine the gun that was located in Tunica County?

A. I did.

Q. And did you compare that gun to these two shell casings that were recovered in Tunica County?

A. I did.

Q. Did these two shell casings match this gun?

A. Yes, sir. Those two shell casings were fired from that gun.

Q. Were you asked to compare the four shell casings that were recovered on Interstate 55 to this gun that was recovered from James Willie in Tunica County?

A. I was.

Q. And were the four shell casings that were recovered on Interstate 55 shot from the gun recovered from James Willie?

A. The four shell casings were fired from that gun.

Q. And were the items – not all of them, but the majority of the items that were recovered from inside Tom Schlender's truck that was found on Interstate 55 fired from the gun that was recovered from James Willie?

A. Two of the projectiles that were recovered from the truck were fired from the gun; and the fragments beared [sic] class characteristics with the gun.

Q. And was [sic] exhibits that were recovered from the body of Tom Schlender during the postmortem examination fired from the gun belonging – or recovered from James Willie?

A. The metal fragment had no comparison value, but the other two projectiles that were submitted from autopsy were fired from the gun in State's Exhibit 43.

¶56. The above testimony shows that the prosecutor elicited from McIntire numerous opinions in absolute terms that the projectiles and fragments in evidence matched the gun found in Willie's possession. Then, in a summary and highly conclusory manner, the prosecutor and the witness reiterated the same testimony. Throughout all of this testimony,

29

Willie's counsel remained silent. Counsel's failure to object reflects a failure to recognize that this Court has placed limitations upon the level of certainty that experts may ascribe to their opinions.

¶57.    This Court has held that, in civil cases, an expert witness's opinion must be stated to a reasonable degree of probability in the witness's field of expertise. *Univ. of Miss. Med. Ctr. v. Lanier*, 97 So. 3d 1197, 1203 (Miss. 2012). In civil cases, the plaintiff bears the burden of proof by the preponderance of the evidence, so expert opinions must be stated to a *reasonable degree of probability*. *See id.* But in criminal cases, because the burden of proof is much higher, "the opinion of an expert witness must be stated with *reasonable certainty*, given the state of knowledge in the field in which the expert is qualified." *Parvin v. State*, 113 So. 3d 1243, 1247 (Miss. 2013) (quoting *West v. State*, 553 So. 2d 8, 20 (Miss. 1989) (emphasis added)). McIntire testified in absolute terms, not to a reasonable degree of certainty in his field of expertise, that the bullets and shell casings matched the pistol Willie admitted having had in his possession at the time of Schlender's murder. Given this Court's limitations on the level of certainty that experts may ascribe to their opinions and the current state of the law concerning firearm identification testimony, counsel's failure to object to McIntire's conclusory testimony was deficient performance.

¶58.    Other courts have recognized that, due to limitations inherent in the field of firearm identification, an expert cannot reliably testify in absolute terms that a bullet was fired from a specific firearm. In *United States v. Taylor*, 663 F. Supp. 2d 1170, 1171 (D. N.M. 2009), the defendant moved to exclude expert testimony that the bullet that killed the victim was

fired in Taylor's rifle. Taylor argued that the methodology used by the firearms examiner[1] was inadmissible under Rule 702. *Id.* at 1175. The district court found that "serious criticisms" of the methodology by commentators warranted the court's careful examination of the reliability of the methodology using the factors from *Daubert*. *Id.* The court found that the methods could be tested and reproduced to some degree, and that the industry published a peer-reviewed journal. *Id.* at 1176. The court recognized that, "because the process is so subjective and qualitative, it 'is not possible to calculate an absolute error rate for routine casework.'" *Id.* at 1177 (quoting *United States v. Monteiro*, 407 F. Supp. 2d 351, 366 (D. Mass. 2006)). Nonetheless, the court found that reports of proficiency testing suggested that the error rate was quite low. *Id.* The court found that the methodology of pattern matching to determine whether there is a match was generally accepted in the field of firearms examination. *Id.* at 1178.

¶59.    But, because the process of determining that a match exists is subjective, the court found deficiency in the standards controlling the technique's operation. The court explained:

> Arguably the biggest obstacle facing any firearms examiner is that there is no such thing as a "perfect match." Even two bullets known to have been fired consecutively from the same gun will display some differences. *See Alfred A. Biasotti, A Statistical Study of the Individual Characteristics of Fired Bullets*, 4 Forensic Sci. 34, 44 (1959). Even more problematic, bullets fired from different guns may have significantly similar markings, reflecting class or sub-class, rather than individual, characteristics. The practice in the field, therefore, as embodied in the [Association of Firearm and Toolmark Examiners (AFTE)] Theory of Identification, calls on examiners to declare an

---

[1]A detailed description of firearm and toolmark identification methodology is provided by *United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006). The pattern-matching methodology used by the experts in *Monteiro*, *Taylor*, and the other cases discussed is the same as that employed by McIntire in all relevant respects.

identification only "when the unique surface contours of two toolmarks are in 'sufficient agreement.' "

*Id.* at 1177. The district court further explained that:

> The AFTE Theory, thus, does not provide any uniform numerical standard examiners can use to determine whether or not there is a match and, indeed, Mr. Nichols indicated in his testimony that most AFT examiners do not use any numerical standard. Instead, the AFTE theory is circular. An examiner may make an identification when there is sufficient agreement, and sufficient agreement is defined as enough agreement for an identification. *See Monteiro*, 407 F. Supp. 2d at 370. The conclusion that there is a match between a recovered bullet and a particular gun is, therefore, necessarily a subjective one, ". . . held in the mind's eye of the examiner and . . . based largely on training and experience in observing the difference between known matching and known non-matching impression toolmarks." *Monteiro*, 407 F. Supp. 2d at 362-63 [internal quotation omitted].

*Id.*

¶60.    The district court identified an additional relevant factor. The court observed that, because the firearm examiner usually is provided only one suspect weapon and recovered projectiles, what occurs is basically an evidentiary "show-up," not a blind test. *Id.* at 1178. The court stated that "[t]he problem with this practice is the same kind of problem that has troubled courts with respect to show-up identifications of people: it creates a potentially significant 'observer effect' whereby the examiner knows that he is testing a suspect weapon and may be predisposed to find a match." *Id.* at 1179.

¶61.    The district court in Massachusetts concluded that an experienced firearms examiner using peer-reviewed methods could testify that a bullet was or was not fired from a particular firearm. *Id.* at 1180. But, due to limitations on reliability, a firearms expert would not be allowed to testify that "that he can conclude that there is a match to the exclusion, either

32

practical or absolute, of all other guns. He may only testify that, in his opinion, the bullet came from the suspect rifle to within a reasonable degree of certainty in the firearms examination field." *Id.*

¶62.    Similar conclusions were reached restricting a firearm and toolmark examiner from making conclusory statements in *United States v. Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008), *United States v. Monteiro*, 407 F. Supp. 2d 351 (D. Mass. 2006), *United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005), and *Commonwealth v. Pytou Heang*, 942 N.E.2d 927, 942 (Mass. 2011).The district court in *Glynn* found that, due to the subjectivity inherent in the methodology, allowing a firearms examiner to testify to an absolute match posed a serious danger of misleading the jury "as to the nature of the expertise involved." *Glynn*, 578 F. Supp. 2d at 574. The court limited firearms examiners to testifying that a match was "more likely than not." *Id.* The court in *Monteiro* concluded that:

> Because an examiner's bottom line opinion as to an identification is largely a subjective one, there is no reliable statistical or scientific methodology which will currently permit the expert to testify that it is a "match" to an absolute certainty, or to an arbitrary degree of statistical certainty. Allowing the firearms examiner to testify to a reasonable degree of ballistic certainty permits the expert to offer her findings, but does not allow her to say more than is currently justified by the prevailing methodology.

*Monteiro*, 407 F. Supp. 2d at 372 (citation omitted). And in *Green*, the court found that an opinion that firearms examination methodology revealed a match between a firearm and shell casings "to the exclusion of all other guns" was unreliable under Rule 702. *Green*, 405 F. Supp. 2d at 124; *see also United States v. Willock*, 696 F. Supp. 2d 536, 546 (D. Md. 2010)

(holding that toolmarks examiners must be limited in the degree of certainty to which opinions are expressed).

¶63.    In addition to these cases calling conclusory firearm identification testimony into question, this issue has arisen in this Court. This Court had before it an attack on the certainty of an expert's conclusion that two distinct groups of bullets were fired in the same gun in *Manning v. State*, 119 So. 3d 293 (Miss. 2013). At Manning's trial, an FBI firearms examiner testified that a bullet found at the crime scene and two bullets found in the body of a victim matched two bullets taken from a tree at Manning's mother's house "to the exclusion of every other firearm in the world." *Manning v. State*, 726 So. 2d 1152, 1181 (Miss. 1998). In that direct appeal this Court had rejected Manning's argument that this testimony was prejudicial. *Id.* One day prior to Manning's scheduled execution, the United States Department of Justice released a letter admitting that the firearm identification testimony was erroneous. Manning submitted the letter with his motion to set aside his convictions and for other relief. The letter stated the following:

> The science regarding firearms examinations does not permit examiner testimony that a specific gun fired a specific bullet to the exclusion of all other guns in the world. The examiner could testify to that information, to a reasonable degree of scientific certainty, but not absolutely. Any individual association or identification conclusion effected through this examination process is not based on absolute certainty but rather a reasonable degree of scientific certainty. As with any process involving human judgment, claims of infallibility or impossibility of error are not supported by scientific standards.

Ex. E to Supplement to Motion to Stay Execution and Set Aside Convictions, Second Motion for Leave to File Successive Petition for Post-Conviction Relief, And Motion in the Alternative for Other Forms of Relief, *Manning v. State*, No. 2013-DR-00491-SCT.

¶64. The letter also stated that "we are notifying the governor's office, attorney general's office, and the defense, as well as the Innocence Project and the National Association of Criminal Defense Lawyers of the errors." *Id.* This Court denied Manning's request for hearings on the reliability of expert testimony on firearms identification, but granted other relief to Manning, including staying his execution. *Manning v. State*, 119 So. 3d 293 (Miss. 2013); *Manning v. State*, 112 So. 3d 1082 (Miss. 2013). The order in *Manning* was handed down and published approximately one year before Willie's trial. *Manning*, 119 So. 3d at 293.

¶65. The record establishes that Willie's trial counsel failed to recognize that, in criminal cases, expert opinions must be stated to a reasonable degree of certainty in the expert's field of expertise. *Parvin*, 113 So. 3d at 1247 (quoting *West*, 553 So. 2d at 20 ). Willie's trial counsel also failed to recognize this Court's order in *Manning* and the case law holding that firearms and toolmark identification testimony is properly limited under Rule 702 to the expert's declaring a match to a reasonable degree of certainty in the firearms and toolmark identification field, not to an absolute certainty.

¶66. McIntire's expert opinions were stated in terms of absolute certainty, not in terms of a reasonable degree of certainty in the field of firearms identification. McIntire testified that the final step in his examination was to view a bullet or shell casing known to have been fired from a pistol linked to Willie and a bullet or shell casing found at the crime scene. McIntire visually observed the known and questioned items simultaneously with the aid of a comparison microscope, a magnification device which allowed McIntire to see both items,

35

microscopically, at the same time. Thus, McIntire's ultimate opinion was reached in a subjective manner by *looking at* two objects, albeit with trained and practiced eyes, in order to decide whether they resembled each other enough, in his opinion, to have been fired in the same firearm. Herein lies the subjectivity weakness that the other courts have found in the firearm identification methodology employed by McIntire and others in his field.

¶67.    The prosecutor did not frame his questions properly, i.e., to a reasonable degree of certainty in the field of firearm identification, and the witness did not so qualify his opinions. Considering the totality of the circumstances, no conceivable trial strategy could have been served by defense counsel's failure to object to McIntire's conclusory testimony. An objection would have given the trial court the opportunity to limit McIntire's conclusions to a reasonable degree of certainty in the firearms examination field. *See **Parvin***, 113 So. 3d at 1247 (quoting ***West***, 553 So. 2d at 20 ). This would have required much more critical jury assessment of the only evidence connecting Willie to the crime in this circumstantial evidence case. Without such limitation, the jury was free to deem McIntire's conclusions absolute. The jury was left to believe that McIntire's expert opinions, thus expressed, were factually correct beyond all doubt. "[A] certain patina attaches to [expert] testimony, running the risk that the jury, labeling it 'scientific,' will give it more credence than it deserves." ***United States v. Green***, 405 F. Supp. 2d 104, 117 (D. Mass. 2005). I would hold that trial counsel's failure to object pretrial and contemporaneously was constitutionally deficient performance.

¶68. Further, I would hold that counsel's failure to object was prejudicial to Willie because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052. The State's entire case rested on McIntire's testimony that the bullets and shell casings found at the crime scene by the medical examiner and those recovered in Tunica County were fired from the gun that Willie admitted had been in his possession at the time of the crime. Only the firearm identification testimony linked Willie with the crime; there was no eyewitness testimony, no DNA evidence, no fingerprint evidence, no evidence of motive, and no confession. The trial court recognized that the State's evidence was entirely circumstantial by granting a circumstantial evidence instruction stating that the State had to prove every element of deliberate design murder beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence.

¶69. Defense counsel did choose to ask McIntire about his margin of error on cross-examination and thereby elicited the answer that McIntire was not infallible. Such brief and vague testimony was not likely to have had much impact upon the weight of McIntire's many unqualified conclusions that the bullets and shell casings collected by investigating officers matched Willie's pistol. But had counsel objected and had the trial court properly limited McIntire's conclusions to a reasonable degree of certainty in the field, the impact of the sole evidence against Willie would have been reduced significantly, especially if followed by effective argument on this all-important topic. The jurors would not have been exposed to purportedly scientific opinions that there was an absolutely definite match between Willie's

37

gun and the bullets and shell casings associated with Schlender's murder. It is well known that "juries usually place greater weight on the testimony of an expert witness than that of a lay witness." *Edmonds v. State*, 955 So. 2d 787, 792 (Miss. 2007). Counsel's failure to object erodes confidence in the outcome of Willie's trial. *See Strickland*, 466 U.S. at 694, 104 S. Ct. 2052.

¶70. I would hold that Willie was denied his constitutionally guaranteed right to the effective assistance of counsel. U.S. Const. amend. VI; U.S. Const. amend. XIV; Miss. Const. art. 3, § 26. Therefore, while I agree that this case must be reversed and remanded due to the improper supplemental jury instruction, I would find that additional reversible error occurred because Willie received constitutionally ineffective assistance of counsel.

**KING, J., JOINS THIS OPINION.**

**RANDOLPH, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶71. When taken in isolation, the jury's question may have been ambiguous. But our precedent requires more. As caselaw is legion, no citation is required for the principle that when read together and taken as a whole, if the *instructions given* fairly announce the law of a case, there is no basis for reversible error. Following that undisputed principle, it cannot be fairly argued that in this case, under these circumstances, the trial court erred. Given the facts found in this record, reversal is not mandated.

¶72. In today's appeal, not a single instruction given has been challenged as an incorrect statement of the law. There is nothing in the judge's response that incorrectly stated the law.

38

He did not enlarge, restrict, or modify any of the instructions given. We can only rely upon what is stated in the transcript and the defendant's arguments because the physical note bearing the jury's query and the judge's response is not part of this record. What are part of this record are the twelve instructions the trial court gave to the jury—nine by the court (C1-C9), two by the State (S1A and S2), and one by the defendant (D2). S1A provided:

**S1A**

The Defendant, **JAMES DOUGLAS WILLIE**, is charged with the crime of Murder.

If you find from the evidence in this case, beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, that:

1.) The deceased, Thomas Schlender, was a living person; and

2.) On or about May 8, 2012 . . . [the Defendant], without authority of law, did shoot with a firearm and kill [Schlender] with the deliberate design to effect the death of [Schlender], then you shall find the Defendant guilty of Murder.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, then you shall find the Defendant not guilty.

After receiving instructions from the court, during its deliberations, the jury submitted a note to the trial judge, which is not a part of the record before us. According to the transcript, the note asked if the jury could "say [Willie] is guilty of having the gun without saying he is guilty of murder." According to the transcript, the judge responded by writing, "No." Again, the judge's written response is not in the record. Willie argues that the query and response could be interpreted as allowing the jury to find Willie guilty of murder if the jury believed him "guilty" of possessing the gun.

¶73. Whether the judge's limited response should be considered an additional written instruction, or a simple response to a jury inquiry, is debatable. Whether his response was an additional written instruction or not, it is beyond question that S1A was before the jury and was a sound instruction. Thus, the jury was properly instructed that it could not convict Willie of murder unless it found beyond a reasonable doubt that Willie deliberately shot and killed Schlender without authority of law. "The jury is presumed to have followed the trial court's instructions." *Galloway v. State*, 122 So. 3d 614, 634 (Miss. 2013). The jury is presumed to have read the judge's response in connection with all instructions previously provided. Assuming, *arguendo*, that the reply was an additional written instruction, and taking all the instructions together, the argument that the jury must have convicted Willie of murder simply upon finding he possessed the gun, without any other element as required by Instruction S1A, is unavailing. Separately, no, the jury could never have found Willie guilty of possession of a gun, as the pseudo-instruction noted (though not part of the record), for he was never separately charged with that crime. The only crime for which he was charged and tried was murder. *See* Instruction S1A. Thus the trial judge's reply did not create reversible error.

¶74. As recognized by Justice Coleman, this Court noted that an inquiry from the jury during deliberations is "[o]ne of the most nettlesome problems" faced by our judges, and recognized that "[w]e really cannot lay down hard and fast legal principles to govern the myriad circumstances in which a problem may arise." *Girton v. State*, 446 So. 2d 570, 572 (Miss. 1984).

In deference we offer some common sense suggestions.

Our first recommendation is that the circuit judge determine whether it is necessary to give any further instruction. Unless it is necessary to give another instruction for clarity or to cover an omission, it is necessary that no further instruction be given.

. . .

The second recommendation requires the trial judge to constantly bear in mind that justice in every trial requires communication and understanding. Unless words are clearly understood, there is only a communication of sound, or worse, a distinct possibility of the receiver of the information placing a different meaning on what is spoken or written than the author meant. This is critical in any communication from the circuit judge to the jury, or between the judge and jury.

Therefore, a judge should make absolutely certain he understands precisely what is meant in any inquiry from the jury. Unless he is quite certain precisely what the jury means in its inquiry, how can the judge know he is responding properly?

*Id.* at 572-73. In *Girton*, a juror sent the following statement to the judge:

To me the State has not proved beyond a reasonable doubt that Mr. Girton was put into a position of having his back to the wall, pushed into a corner and made to take some sort of action to protect his life, family or home. The action he took may not have been proper, but it might have been the only action he felt he could take at the time. Some of the other Jurors tell me I am not following the law as it was laid out for us (And there is what, I believe to be a period) My feelings, if I am wrong, please show me at what point I am failing and I could possibly change my opinion.-signed Boyd Goodnight.

*Id.* at 571. The judge responded as follows:

The State does not have to prove that the acts of the Defendant were reasonable. It is a question of fact for the Jury to determine. The reasonableness of his acts are factual questions. Apply the written instructions to the facts as you determine them to be.

*Id.* at 572. We noted that, in that case,

41

the circuit judge may have understood precisely what Juror Goodnight meant. While this Court believes we have some understanding of what was troubling this juror, we must at the same time concede we are not sure.

If the juror was indeed resolving an inquiry on a certain principle of law as appears from this record, and as the circuit judge apparently understood it, the principle of law had already been thoroughly covered in the two previous instructions. Also, as we have noted, we cannot be sure what this juror meant.

*Id.* at 573. This Court recognized that,

because the meaning of the juror's inquiry was not completely free from doubt, it would have been preferable for the circuit judge to see that the meaning was unquestionably clear before making a determination whether a response was necessary. Further, even the meaning ascribed by the circuit judge to the inquiry required nothing more than a court direction to follow the instructions.

*Id.* at 575. Nevertheless, we found no error in the trial court's response, as there was "absolutely nothing about either the inquiry or the circuit judge's response which would induce an otherwise doubtful juror to return a verdict of guilty." ***Id.***

¶75.    As so aptly addressed by the well-seasoned and experienced jurists, unanimously accepted and stated in ***Girton***, we should not lay down hard and fast legal principles to govern every circumstance that might give rise to a jury inquiry during deliberations. That Court offered common-sense suggestions, all the time giving due deference to the trial judge. In this case, the judge determined it was necessary to answer the jury's inquiry. He reached that decision after conferring with both the district attorney and defense counsel. In this case, the judge believed he understood what the jury was asking. The judge and attorneys for the defendant and the State considered the inquiry as regarding a lesser-included offense. The judge's response was proper in this case—the jury could not find Willie guilty of a crime for which he was not charged and on which it received no instruction. While a *better* response

42

may have been to simply inform the jury that it had already been properly instructed and to refer to the instructions given, I cannot say that the trial judge *abused his discretion* in responding as he did. *See id.* at 575. In the words of the **Girton** Court, while we may "have some understanding of what was troubling this jur[y], we must at the same time concede we are not sure." *Id.* at 573. In any event, there is "absolutely nothing about either the inquiry or the circuit judge's response which would induce an otherwise doubtful juror to return a verdict of guilty," on the charge of deliberate-design murder. *See id.* at 575. Instruction S1A instructed the jury to find the defendant not guilty if the State failed to prove any one of the listed elements of deliberate-design murder beyond a reasonable doubt. *See* Instruction S1A (requiring a finding that Willie deliberately shot and killed Schlender without authority of law beyond a reasonable doubt in order to convict).

¶76.    Utilizing cases factually dissimilar to the one *sub judice* is an all-too-common practice. Using pinpoint citations from dissimilar cases violates the prime directive of *stare decisis*, that "like cases ought to be decided alike." *See* **State ex rel. Moore v. Molpus**, 578 So. 2d 624, 634 (Miss. 1991). None of the accessory cases relied upon by Justice Coleman are like cases.

¶77.    In **Berry v. State**, the jury was given contradictory instructions, which had been filed and given to the jury before deliberations began. **Berry v. State**, 728 So. 2d 568, 571 (Miss. 1999). One informed the jury of the elements of the underlying crime and the State's burden of proof. *Id.* However, another explicitly informed the jury that it could convict the defendant for the underlying crime if the jury found the defendant committed "*any* act which is *an*

43

*element* of the crime" rather than proving all elements of the crime beyond a reasonable doubt. *Id.* at 570 (emphasis added). Concerning "a nearly identical accessory instruction," this Court found no reversible error, as other instructions made clear "that the State was required to prove every element of the crime beyond a reasonable doubt." *Id.* (citing *Simmons v. State*, 568 So. 2d 1192 (Miss. 1990)). In a case similar to *Berry*, but not the case *sub judice*, and acknowledging *Simmons*, this Court held a trial judge in error for giving this type of accessory instruction. *Hornburger v. State*, 650 So. 2d 510, 515 (Miss. 1995). Yet the *Hornburger* Court found that error was harmless, given that other instructions informed the jury of the State's burden to prove each element of the crime beyond a reasonable doubt. *Id.* Finally, in *Liggins v. State* (another accessory case unlike today's), this Court reversed a conviction predicated on an accessory instruction, because the instruction informed the jury that it *must* convict the defendant if it found the defendant encouraged the commission of a crime and did any act which was an element of that crime. *Liggins v. State*, 726 So. 2d 180, 184 (Miss. 1998).

¶78.    If the cases cited by Justice Coleman can offer us guidance, it is that each case must be decided on the facts of that case alone, applying the law consistently. Contrary to these accessory-instruction cases, the instructions actually given in this case were not contradictory. It is only when a "spin" is advanced of other possibilities, as argued by the defendant's able counsel, that error is suggested. The jury was clearly instructed that the State had to prove each and every element of deliberate-design murder beyond a reasonable doubt. When the jury asked if it could convict Willie for possessing a gun without finding him guilty

of murder, the trial judge specifically responded with "No," if we rely on the transcript. The attorneys pointed out during the bench conference that the jury was given no instruction regarding possession of a firearm. The jury asked a yes or no question. Can reasonable jurists not agree that it would have been improper for the judge to have responded in the affirmative?

¶79. Justice Coleman correctly concludes that Willie's failure to object to the judge's response bars us from reviewing this issue absent plain error,[2] yet then diverts to a plain-error analysis, which I cannot join. Requirements for plain-error analysis have not been met. We cannot say with certainty that "the error prejudiced the outcome of the trial." *See Foster v. State*, 148 So. 3d 1012, 1018 (Miss. 2014). During the bench conference regarding the jury's inquiry, the trial judge, defense counsel, and the district attorney all regarded the inquiry as one related to lesser-included offenses. That very well may have been the jury's inquiry. If the trial court erred in that assessment, it was not "plain, clear, or obvious." *See id.*

¶80. In this case, there is sufficient evidence to support the jury's verdict convicting Willie of deliberate-design murder. Faced with record evidence, we cannot say that the verdict "resulted in a manifest miscarriage of justice." *See id. See also Haynes v. State*, 934 So. 2d 983, 991 (Miss. 2006) (This Court has held "errors involving a violation of an accused's constitutional rights may be deemed harmless beyond a reasonable doubt where the weight of the evidence against the accused is overwhelming.").

---

[2]*See* Coleman Op. ¶ 28 (citing *Fitzpatrick v. State*, 175 So. 3d 515, 522 (Miss. 2015)).

¶81. In sum, reading the judge's response to the jury's inquiry in connection with the instructions given results in a clear announcement of the law applicable to this case. The judge's response did not lessen the State's burden of proof one iota, nor did it give the jury an "additional option" of "finding Willie guilty of murder if the jury also thought him 'guilty' of possessing a gun," as posited by the defendant and accepted by Justice Coleman's opinion. Coleman Op. ¶ 35. The judge's response correctly told the jury that it could not find Willie guilty of possessing a gun—a crime with which he was not charged and on which the jury was not instructed. I would find the trial judge's actions proper. Even if I assumed the trial judge erred, the result would be no different. No error is so "plain, clear, or obvious" as to warrant reversal.

**WALLER, C.J., MAXWELL AND BEAM, JJ., JOIN THIS OPINION.**